914 F.2d 259
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
John WIGMAN, Defendant-Appellant.
 No. 89-2129.
 United States Court of Appeals, Sixth Circuit.
 Sept. 4, 1990.
 
 Before MERRITT, Chief Judge; BOYCE F. MARTIN, Jr. and DAVID A. NELSON, Circuit Judges.
 
 
 1
 MERRITT, Chief Judge. Defendant appeals a jury verdict convicting him of misapplication of bank funds in violation of 18 U.S.C. Sec. 656 (1988), making false statements on loan applications in violation of 18 U.S.C. Sec. 1014 (1988), and conspiracy to commit these crimes. On appeal, defendant claims that the District Court erred in admitting through oral testimony certain business records of the Bank, that the jury had inadequate evidence to convict defendant of misapplication of bank funds, that the prosecutor exceeded acceptable limits in the government's closing statement, and that the District Court violated Fed.R.Crim.P. 32 by failing to establish the amount of money that defendant misapplied. Because we find that the admission of the business records was harmless error and that there is no merit in defendant's two other claims about his conviction, we affirm the conviction but we remand to the District Court to establish the amount involved in defendant's crimes.
 
 I.
 
 2
 Defendant served Comerica Bank in Roseville, Michigan, as a loan officer with a lending limit for personal, unsecured loans of $5,000. With the aid of his co-conspirators, defendant authorized numerous $5,000 Cash Reserve Account Loans, a special form of an unsecured loan, between March and August 1984. The co-conspirators would funnel applicants to defendant. The applicants were mostly members of the Chaldean community in Roseville who were recent immigrants or friends or relatives of the co-conspirators. These applicants would seek out defendant, who, along with the co-conspirators, would fill out the loan applications with incorrect information about the applicant's employment, pay, and residence, and would then issue the loan without checking the applicant's credit history. Many of the applicants were listed as owners, managers or employees of the Jefferson Chene Market or the Jefferson Quality Market with annual incomes over $48,000. In fact, many of the applicants had minimum wage jobs or were unemployed. For example, Sherri Vandenberg testified that she had previously told defendant that she was a student working part time for $3.35 an hour at J.C. Penny, but defendant filled out her application showing her as the manager of one of the markets at $48,000 a year. The applicants took out the loans because defendant's co-conspirators had asked them for financial help. The co-conspirators would then give the applicants a small part of the proceeds to thank them for applying for the loans. Most of the loans were never repaid.
 
 
 3
 At trial, the government sought to prove the lack of repayment using certain records from the Bank's credit department. The District Court permitted the introduction of this evidence through only oral testimony, not the records themselves, because the records contained some statements regarding an internal bank investigation of defendant and an FBI investigation about defendant's loans, both of which the District Court held were more prejudicial than probative. The government called David Petrusak, the head of the Bank's collection department, to testify about the collection records. These records contained memorializations of conversations held with people outside the Bank. Defendant objected to the introduction of this evidence, claiming that its introduction violated the rule against hearsay.
 
 
 4
 The jury convicted defendant of all counts. At sentencing, the trial judge did not determine how much money was involved in the case because it would not affect defendant's sentence. When defendant argued that it would affect his parole date under the Parole Guidelines, the District Court said he would leave the determination of the amount up to the Parole Commission. He also ordered restitution in an amount to be determined by the Parole Commission.
 
 II.
 
 5
 On appeal, the defendant argues persuasively that the admission of the Bank's collection records through the testimony of Mr. Petrusak violated the rule against the admission of hearsay. He contends that the statements from persons outside the Bank's employment constitute double or triple hearsay and that no independent hearsay exception such as the business records exception exists to permit the introduction of these statements.
 
 
 6
 "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Fed.R.Crim.P. 52(a). Assuming that the admission of the statements of outsiders in business records violates the rule against hearsay, the defendant cannot show how the introduction of this evidence prejudiced him. Most of the statements came from people who later testified at the trial. The defendant had the opportunity to cross-examine these witnesses about their statements to the Bank, which reduced the amount of prejudice to defendant to a minimum. Upon reviewing the record, we find only nine statements in the records that were made by people who did not testify later at trial.[1]
 
 
 7
 1. Lewis Drucker, the brother of Cindy Drucker, a borrower who testified at trial, told the collection department that Cindy never lived in Michigan but lived in New York. J.A. at 234. Ms. Drucker later testified and corroborated this information.
 
 
 8
 2. The sister of Kimberly Hardy, another borrower, stated that Kimberly was not at home and asked for a copy of the loan application. J.A. at 250.
 
 
 9
 3. The wife of George Mio, another borrower, said that they had made a payment on the loan, and that they would try to bring the account current. J.A. at 259-62.
 
 
 10
 4. Fawzi Talia's wife told that Bank that Mr. Talia did not speak English, that they were unemployed and living on welfare, and that the Bank should contact Sam Hanna, one of the co-conspirators, about getting payment. J.A. at 268-74. Mr. Talia later testified through an interpreter and corroborated this information.
 
 
 11
 5. Hassan Dagher, a borrower, told the Bank that he has business and "doesn't want any surprise attacks." J.A. at 288-90.
 
 
 12
 6. The father of Zia Denha told the Bank that Zia was on vacation and that the father would pay for the son's loan. J.A. at 290-92. Zia Denha later testified.
 
 
 13
 7. Violet Nefsu, a borrower, told the Bank that her account was handled by Isam Yousif, her husband. J.A. at 303-06. Mr. Yousif later testified.
 
 
 14
 8. Jacqueline Hanna also told the Bank that her husband, Sam Hanna, handled her account. J.A. 308-09. Mr. Hanna later testified.
 
 
 15
 9. The Bank also called Steve Yousif, an indicted co-conspirator who pled guilty before trial, many times about several of the loans. These statements would be admissible under Fed.R.Evid. 801(d)(2)(E) excluding statements of co-conspirators from the definition of hearsay if made during the pendency and in furtherance of the conspiracy.
 
 
 16
 None of these instances of alleged hearsay prejudice defendant. None of them even refer to defendant. The admission of these statements, even if it did violate the rule against hearsay, constitutes harmless error and we will therefore disregard it.
 
 III.
 
 17
 Our Court's most recent cases on what supports a Sec. 656 conviction are United States v. Hughes, 891 F.2d 597 (6th Cir.1989), and United States v. Woods, 877 F.2d 477 (6th Cir.1989) (per curiam). In essence, the government must prove that defendant intended to harm the Bank through fraudulent or dishonest means or acted so recklessly as to be tantamount to fraud with respect to the Bank's interests. Defendant claims that he did not benefit from the loans and, despite the fact that he violated the Bank's loan procedures, he believed that his co-conspirators would pay the loans back. The government claims that the evidence shows a fraudulent intent.
 
 
 18
 The defendant relies on United States v. Cleary, 565 F.2d 43 (2d Cir.1977), cert. denied, 431 U.S. 915 (1978), to prove his inadequacy argument. In that case, the Second Circuit reversed a Sec. 656 conviction of a banker who believed that others would pay back loans issued to third parties.
 
 
 19
 The thrust of the Government's charge against Cleary was that he approved loans to third persons knowing that the proceeds were going in whole or in part to appellant Passarelli. However, loans of this character are improper only if the lending officer had no reason to expect that the named debtor would repay them; e.g., where the officer knew that the named debtor was fictitious, had not authorized the use of his name, or was incapable of repaying the loan, or where the bank official assured the named debtor that he would not be called upon to repay.
 
 
 20
 Id. at 47. The problem this defendant has in relying on Cleary is that the government offered circumstantial evidence to show that defendant must have thought that the named debtor would not repay the loan. Defendant helped create fictitious employment and income information for the applicants. He knew that the information he created about the loans was entirely false, and it is reasonable to infer the requisite fraudulent state of mind because any reasonable bank officer in these circumstances would expect that the result which did occur would occur--namely, nonpayment.
 
 IV.
 
 21
 The defendant maintains that the government exceeded acceptable limits for closing arguments when it discussed the possible motives that defendant may have had in committing these crimes. The question in deciding whether to reverse a case on the basis of the government's closing is whether the admission of the improper statement constitutes prosecutorial misconduct and violates due process. United States v. Young, 470 U.S. 1, 16 (1985) (statements "were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice."); see also Darden v. Wainwright, 477 U.S. 168, 181 (1986) (due process standard applied); United States v. Walther, 867 F.2d 1334, 1341 (11th Cir.) ("The test for determining prosecutorial misconduct is whether the remarks were improper and prejudicially affected the substantial rights of the defendants."), cert. denied, 110 S.Ct. 144, 506 (1989); United States v. Gonzalez, 833 F.2d 1464, 1466 (11th Cir.1987) (same). These statements do not violate the strict due process standard, and therefore do not constitute reversible error.
 
 V.
 
 22
 At sentencing, defendant contested the amount of money that the government said was involved in the crimes. Defendant argues that the District Court should have set an amount because the amount affects his parole date under the Parole Commission guidelines. However, we need not rule on that issue, because the District Court also ordered the defendant to pay restitution. J.A. at 580. Because the amount of restitution depends on the amount of money involved in defendant's crimes, we remand the case to the District Court with instructions to determine the amount of money involved in the crime.
 
 VI.
 
 23
 Accordingly, the conviction of defendant is AFFIRMED. The case is REMANDED to the District Court with instructions to determine the amount of money involved in the crime.
 
 
 
 [1]
 In a supplemental brief submitted to the Court, defendant lists many instances of individuals whose statements appear in the Bank's records. Most of these references are unhelpful to defendant's case because most of the declarants testified at the trial and were available for cross-examination. The only instances that defendant cites where it is not clear that the declarants testified later are the various statements made in connection with the collection of Mouayad Mio's loan, J.A. at 278-84. Most of the declarants appear to be relatives of Mr. Mio, and many people with the last name of Mio testified at the trial. Although we do not know all of the familial interconnections of the Mios, it is probable that many of these declarants later testified at trial. In addition, none of the statements say anything about defendant and are thus harmless