**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carl Harold MYERS, Defendant–Appellant.**

No. 91–8567.

United States Court of Appeals,
Eleventh Circuit.

Sept. 25, 1992.

William J. McKenney, McKenney & Froe-
lich, Atlanta, Ga., for defendant-appellant.

Lisa J. Stark, U.S. Dept. of Justice,
Washington, D.C., for plaintiff-appellee.

Before BIRCH, Circuit Judge,
JOHNSON, and BOWNES *, Senior Circuit
Judges.

BOWNES, Senior Circuit Judge:

Appellant, Carl Harold Myers, former
Doraville Police Department Captain, was
convicted on two counts of depriving two
arrestees, Frederick Cowan and Gabriel
Raul Reynaga (also known as Cesar Yanez,
which is the name we use), of their civil
rights under color of law, in violation of 18
U.S.C. § 242 (1992),[1] by using a stun gun to
shock them. Appellant raises numerous
contentions on appeal, arguing that the dis-
trict court committed errors in three areas:
1) the applicable standard of reasonable
force; 2) jury instructions; and 3) eviden-
tiary rulings. We find that there are no
grounds for reversal.

## BACKGROUND

We review the evidence in the light most
favorable to the government. *Glasser v.
United States*, 315 U.S. 60, 80, 62 S.Ct.
457, 469, 86 L.Ed. 680 (1942); *United
States v. Perez*, 956 F.2d 1098, 1102 (11th
Cir.1992).

## I. THE FACTS

At the time the incidents giving rise to
the criminal action occurred, Myers was a
captain in the Doraville Police Department.

He had been with the police department for
twenty-one years.

### A. Cowan

On August 25, 1988, around 1:30 a.m.,
officers of the Doraville Police Department
arrested Frederick Cowan at his home for
driving without lights, driving while under
the influence, and resisting arrest. Cowan
was taken to the station and placed in a
holding cell. Cowan had been drinking pri-
or to his arrest. According to radio dis-
patcher Ryan Fleming, who testified as a
government witness, Cowan "looked vio-
lent" as he was led handcuffed to the cell.
Throughout the night, Cowan yelled, rat-
tled and kicked the bars of his cell, and
asked to see a doctor.

Around 5:15 or 6:00 that morning, Myers
reported for duty as the watch commander
at the station. Myers testified that he was
informed by radio dispatcher Clint Jett that
Cowan was high on dope, had been fighting
with police officers, had broken his prison
bunk, and that two officers had been hurt
in attempting to arrest him. Myers further
testified that when he asked Jett why Co-
wan had not been shackled,[2] Jett responded
that he was "scared to go back there."

Myers went to his office, which was up-
stairs in the station, to obtain his stun gun
that he kept inside his desk. A stun gun is
a battery-operated device that sends electri-
cal voltage into a person's body when fired.
The electric charge retards or paralyzes
muscle movement for a period of time.

Myers had purchased the stun gun in
1988 or 1989 when he was then a Lieuten-
ant with the Doraville Police Department.
He purchased the gun for use against

---

* Honorable Hugh H. Bownes, Senior U.S. Circuit
Judge for the First Circuit, sitting by designa-
tion.

1. 18 U.S.C. § 242 provides in pertinent part,
Whoever, under color of any law, statute,
ordinance, regulation, or custom, willfully
subjects any inhabitant of any State, Territo-
ry, or District to the deprivation of any rights,
privileges, or immunities secured or protected
by the Constitution or laws of the United
States, or to different punishments, pains, or
penalties, on account of such inhabitant being
an alien, or by reason of his color, or race,

than are prescribed for the punishment of
citizens, shall be fined not more than $1,000
or imprisoned not more than one year, or
both; and if bodily injury results shall be
fined under this title or imprisoned not more
than ten years, or both....

2. Shackling is a procedure by which the prison-
er is handcuffed with his hands attached to one
end of the bunk and his feet cuffed at the
opposite end, in order to prevent injury to the
prisoner and/or damage to the cell.

"rowdy prisoners." Chief Everett and Assistant Chief William Davis of the Doraville Police Department both had informed Myers that the stun gun was unauthorized and told him not to use it. Doraville Police Department regulations provided that an officer could not use a stun gun without official authorization.

Myers, accompanied by Jett and Fleming, entered Cowan's cell with the stun gun. Myers directed Cowan to move away from the cell door with his back to the wall so that he could safely enter the cell. Cowan responded, "M.F. I'm not going anywhere." Myers activated the stun gun and entered the cell. He asked Cowan to lay down and stretch his hands above his head so that he could be handcuffed to the bunk. When Cowan, who was sitting on the bunk, failed to respond, Myers aimed the stun gun at Cowan's chest and fired it. Cowan closed his eyes, looked as if he was in pain, screamed loudly, and in a movement like a muscle contraction, laid down flat on his back on the bunk. Jett then handcuffed Cowan's hands over his head. As Jett was facing the wall pushing Cowan's legs down to shackle them, Myers aimed the stun gun at Cowan's groin area and fired it. Cowan screamed loudly and flinched. Jett then shackled Cowan's feet to the end of the bunk. Cowan had neither been fingerprinted nor booked when these events occurred.

Fleming testified that the next day, Jett expressed concern about what would happen if anyone learned of the incident and told Fleming that he "needed to be careful what [he] said about the incident that happened." Fleming further testified that Myers told him that he was "going to be the one to clear [Myers]," and that he "remembered the ones that helped him and the ones that hurt him."

### B. Yanez

During the early morning hours of September 21, 1989, the Doraville Police arrested Cesar Yanez in a parking lot for having an open can of beer in public. The arresting officer radioed ahead for assistance because Yanez was yelling obscenities as he was being transported to the police station. When Yanez arrived at the station, he continued to yell obscenities and challenged various officers to a fight. The officers laughed at Yanez, who was five feet two inches and weighed 115 pounds, and appeared to be intoxicated. Myers grabbed Yanez by the throat and told him not to scream at the officers.

Yanez was taken to a holding cell inside the station. While in the cell, Yanez continued yelling obscenities and making threatening remarks. Myers entered the cell, showed Yanez the stun gun, activated it, and asked him if he had ever seen one before. Yanez responded, "Maybe I have and maybe I haven't." Myers then informed Yanez that the stun gun would be used if he did not settle down and allow himself to be searched.

Myers then told radio dispatcher Fleming to escort Yanez out of the cell to the back area of the station to be booked, searched, and processed. Myers walked Yanez down the corridor with the stun gun aimed at Yanez's back, between the shoulder blades. Myers kept his other hand on Yanez's chest. Before they reached the cell door area, Myers fired the stun gun. Fleming testified that at the time, Yanez was turning his head talking. Myers fired the stun gun again when Yanez grabbed the cell bars. Yanez was then placed up against a wall, with both hands against the wall and legs spread, so Fleming could search him. Fleming testified that Yanez complied with orders to remove his personal property from his pockets and did not make any threatening moves.

During the frisk, Myers fired the stun gun against Yanez's lower neck and upper back area. Yanez flinched and then looked at Myers and said, "If that is all you got, I can take some more." Yanez did not remove his hands from the wall or attempt to strike the officers. Yanez and Myers got into a shouting match and Myers fired the stun gun at Yanez a few more times.

On September 25 and 26, 1989, Lieutenant Welch, a nineteen-year veteran of the force, observed Yanez's back and saw six pairs of scabbed reddish burn marks approximately two and one half inches apart.

Lieutenant Welch testified that the marks were consistent with those left by a stun gun.

## II. LEGAL PROCEEDINGS

On March 8, 1991, a jury convicted Myers of violating the civil rights of Cowan and Yanez, while acting under color of law, by shocking them with a stun gun, in violation of 18 U.S.C. § 242. The jury found that the violation of Yanez's civil rights resulted in his bodily injury. The district court sentenced Myers to twelve months imprisonment for violating Cowan's civil rights and eighteen months for violating Yanez's civil rights, to be served concurrently. It also imposed a fine of $5,000 and a special assessment of $75. Myers filed this timely appeal.

## DISCUSSION

### I. THE CONSTITUTIONAL STANDARD

■ The district court instructed the jury to evaluate Myers' conduct under an objective reasonableness standard.

> All persons live under the protection of our constitution and have the legal right at all times to be protected from any official use of force which is unreasonable and excessive.... To determine whether the acts, if any, were beyond the lawful authority possessed by defendant as a police officer, you must determine whether the force used was unreasonable. Whether or not the force used by a police officer was unreasonable is an issue to be determined by you in the light of all the surrounding circumstances, on the basis of that degree of force a reasonable and prudent officer would have applied under the circumstances in this case.

In his pretrial discussions with counsel, the district court made it explicit that he was applying the Fourth Amendment standard.

Myers objected to the excessive force instruction, arguing that the Eighth Amendment standard of "malicious and sadistic force applied for the very purpose of causing harm" should have been given instead. On appeal, Myers has raised for the first time the contention that the Fourteenth Amendment "shocking to the conscience" standard governs. Federal Rule of Criminal Procedure 30 provides in pertinent part:

> No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects *and the grounds of the objection.*

(emphasis ours).

In *United States v. Hines,* 955 F.2d 1449 (11th Cir.1992), this circuit stated:

> According to the Federal Rules of Criminal Procedure, absent timely objection, only *plain error* in a charge warrants reversal. Fed.R.Crim.P. 30; Fed. R.Crim.P. 52(b). Plain error results only if "when examined in the context of the entire case, [it] is so obvious that failure to notice it would seriously affect the fairness, integrity and public reputation of the proceedings." *United States v. West,* 898 F.2d 1493, 1498 (11th Cir.1990), *quoting United States v. Walther,* 867 F.2d 1334, 1343–44 (11th Cir.1989).

*Id.* at 1453.

Because of defendant's failure to state that the Fourteenth Amendment was one of the grounds of this objection to the charge, the Fourth Amendment instruction is subject to attack only on Eighth Amendment grounds. It is beyond cavil that the Eighth Amendment applies only after a prisoner is convicted. *See Graham v. Connors,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "[T]he less protective Eighth Amendment standard applies 'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.'" *Id.* at 398–99, 109 S.Ct. at 1873, *quoting Ingraham v. Wright,* 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 1412 n. 40, 51 L.Ed.2d 711 (1977). *See also Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986) (after conviction, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force

is challenged as excessive and unjustified."). Cowan and Yanez had not been convicted of any crimes at the time Myers used the stun gun on them. We reject Myers' contention that the Eighth Amendment standard applies in evaluating his use of excessive force.

Although we uphold the instruction given, we wish to make it explicit that we are not deciding that the Fourteenth Amendment's "shocking to the conscience" standard does not apply in evaluating the use of excessive force by the police in post-arrest, pre-charge cases. That issue is not before us. We hold only that it was not plain error for the district court to give the instruction it did.

## II. JURY INSTRUCTIONS

■ We review jury instructions *de novo* to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party. *See Johns v. Jarrard*, 927 F.2d 551, 554 (11th Cir.1991); *National Distillers, etc. v. Brad's Machine Products*, 666 F.2d 492, 497 (11th Cir.1982).

Myers contends that the court erred threefold in charging the jury: 1) in its definition of "bodily injury"; 2) in refusing to give two requested instructions; and 3) in its instruction as to intent.

### A. Definition of "bodily injury"

■ In defining "bodily injury," the court gave the following instruction:

Counts Two and Three charge the defendant's acts resulted in bodily injury to the persons in custody named in those counts. You are instructed that bodily injury means any injury to the body, no matter how temporary. Bodily injury also includes physical pain as well as any burn or abrasion.

The defense objected to the instruction as being "overly broad, vague, and not defined in the criminal statute," but did not provide the court with an alternative definition of "bodily injury." On appeal, Myers claims that the court should have used the Georgia state definition of "bodily injury," under the State's battery statute:

(b) As used in this code section, the term "visible bodily harm" means bodily harm capable of being perceived by a person other than the victim and may include, but is not limited to, substantially blackened eyes, substantially swollen lips or other facial or body parts, or substantial bruises to body parts.

O.C.G.A. § 16–5–23.1. We disagree. We are dealing with a federal crime involving police behavior. Federal law controls.

■ Courts should give statutory language its ordinary, usual, and plain meaning. *See Connecticut Nat'l Bank v. Germain*, —— U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992); *Ardestani v. I.N.S.*, —— U.S. ——, ——, 112 S.Ct. 515, 519, 116 L.Ed.2d 496 (1992); *Gulf Life Ins.*, 809 F.2d 1520, 1522 (11th Cir.1987). The problem is that the statute in question, 18 U.S.C. § 242, does not define "bodily injury." It states that "[i]f *bodily injury* results [from a violation of the statute, the violator] shall be fined under this title or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life." 18 U.S.C. § 242 (emphasis added). When Congress uses, but does not define a particular word, it is presumed to have adopted that word's established meaning. *See Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). "Congress is deemed to know the executive and judicial gloss given to certain language and thus adopts the existing interpretation unless it affirmatively acts to change the meaning." *Florida Nat'l Guard v. Federal Labor Rel. Auth.*, 699 F.2d 1082, 1087 (11th Cir.), cert. denied, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983). "Congressional silence in the Act indicates acceptance of the prior practice." *Id.; see also Estate of Wood v. C.I.R.*, 909 F.2d 1155, 1160 (8th Cir.1990).

Congress has defined "bodily injury," in many different contexts. The definition commonly used is, "the term 'bodily injury' means—(A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of a function of a bodily member, organ, or mental faculty;

or (E) any other injury to the body, no matter how temporary." *See* 18 U.S.C. §§ 831(f)(4) (prohibiting transactions involving nuclear materials); 1365(g)(4) (tampering with consumer products); 1515(a)(5) (obstruction of justice); 1864(d)(2) (hazardous or injurious devices on federal lands). This definition of "bodily injury" comports with that used by the district court in instructing the jury. The court did not err.

### B. Jury Instruction on Presumption of Intent

■ Myers contends that the court committed reversible error in its instruction on intent because it impermissibly shifted the burden of proof.[3] Defendant objected to the following sentence in the instruction: "For example, you may infer that a person ordinarily intends all the natural and probable consequences of an act knowingly done." Myers contends that the instruction as given created a presumption which shifted the burden of proof to him once the government had proven the predicate acts. He further argues that the jury could have read the instruction as requiring it to infer the intent to violate a constitutional right and to cause bodily injury as a natural and probable consequence of the act of using a stun gun on arrestees.

■ In determining whether an instruction impermissibly shifts the burden of proof to a defendant, the threshold inquiry is whether the challenged portion of the charge creates a mandatory presumption or merely a permissive inference. *See Francis v. Franklin,* 471 U.S. 307, 314, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985); *Santiago Sanchez Defuentes v. Dugger,* 923 F.2d 801, 804 (11th Cir.1991). We must review the challenged jury instruction by reviewing the entire jury charge. *Santiago Sanchez Defuentes,* 923 F.2d at 804. A permissive inference or presumption allows, but does not require, the jury to "infer the elemental fact from proof by the prosecutor of the basic one and [ ] places no burden of any kind on the defendant." *Id. quoting Ulster County Court v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1979). A permissive inference is not burden shifting and, therefore, does not violate the due process clause. *Id.*

We find that the court's jury instructions as to intent created a permissive inference and did not shift the burden of proof onto Myers in violation of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) (invalidating a charge that stated: "[t]he law presumes that a person intends the ordinary consequences of his acts."). The district court explicitly informed the jury that it "may" infer, and not that it "must" infer, intent. This circuit has approved similar jury instructions that allow the jury to infer intent from the natural and probable consequences of an act. *See, e.g., Hill v. Kemp,* 833 F.2d 927, 930 (11th Cir.1987) (charge was "simply a classic circumstantial evidence charge indicating that the jury *may* make certain inferences from the evidence"); *United States v. Cotton,* 770 F.2d 940, 946 (11th Cir.1985) (jury instruction did not relieve prosecution of its burden of proof nor would undermine jury's fact-finding responsibilities).

Examining the jury charge as a whole shows that the court did not relieve the government of its burden of persuasion beyond a reasonable doubt of every essen-

---

**3.** The court gave the following instruction on specific intent:

 With regard to specific intent, you are instructed that intent is a state of mind and can be proved by circumstantial evidence. Indeed, it can rarely be established by any other means. In determining whether this element of specific intent was present, you may consider all of the attendant circumstances of the case.

 For example, you may infer that a person ordinarily intends all the natural and proba-

ble consequences of an act knowingly done. In other words, you may in this case infer and find that the defendant intended all the consequences that a person, standing in like circumstances and possessing like knowledge, should have expected to result from his or her act or acts knowingly done. This would be circumstantial evidence of his intent. However, you must still be convinced beyond a reasonable doubt that the defendant willfully deprived the person in custody of his constitutional rights.

tial element of the crime.[4] We conclude that the district court did not err in its instruction on intent.

## C. Refusal to Give Jury Instructions

Myers further contends that the court committed reversible error in refusing to give two jury instructions that he requested.

■ A trial court has wide discretion as to the "style and wording" of jury instructions, and on appeal we review the court's instructions only to determine that they "show no tendency to confuse or to mislead the jury with respect to the applicable principles of law." *Samples v. City of Atlanta,* 916 F.2d 1548, 1550 (11th Cir.1990) (quoting *Andres v. Roswell–Windsor Village Apartments,* 777 F.2d 670, 673 (11th Cir.1985)).

■ We can find that a district court committed reversible error in failing to give a requested jury instruction if, and only if, three requirements are met. The proposed jury instructions must be: 1) correct; 2) not substantially covered by other instructions that were delivered; and 3) so important that the court's failure to give it "seriously impairs the defendant's ability to defend himself." *United States v. McEvoy,* 820 F.2d 1170, 1172 (11th Cir.), *cert. denied,* 484 U.S. 902, 108 S.Ct. 243, 98 L.Ed.2d 201 (1987).

■ Myers' first claim is that the court should have instructed the jury that it could not consider the fact that a stun gun was an unauthorized weapon in the Doraville Police Department.[5] Myers proffers that this instruction was to rebut evidence introduced that the stun gun was an unau-

thorized weapon.[6] In determining whether a defendant in an excessive force case has acted "reasonably," it is proper to look to the existence of police regulations. *See Tennessee v. Garner,* 471 U.S. 1, 15–19, 105 S.Ct. 1694, 1703–05, 85 L.Ed.2d 1 (1985). We find no error.

■ The second jury instruction that Myers claims was erroneously omitted has to do with his theory of defense. The proposed instruction reads as follows:

> Ladies and Gentlemen of the Jury, I charge you that the Defendant maintains he is entitled to use reasonable force not only to defend himself, or others, but to accomplish legitimate law enforcement objectives such as fingerprinting a suspect, photographing a suspect or maintaining order. If you find that the Defendant utilized reasonable force to accomplish a legitimate law enforcement objective, you must find the Defendant not guilty.

The court charged the jury:

> A law enforcement officer is justified in the use of only that force which he reasonably believes to be necessary to hold someone in custody or to defend himself or another from bodily harm. He may not, however, use more force than is reasonably necessary to accomplish those purposes. To determine whether the defendant used excessive force, you should consider all the circumstances in the case from the point of view of a reasonable officer on the scene of the incident. . . .
>
> [A] defendant is entitled to use reasonable force to accomplish legitimate law enforcement objectives. If you find that

---

**4.** For example, the court further instructed the jury that,

> The law does not require a defendant to prove his innocence or produce any evidence at all. The government has the burden of proving a defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find the defendant not guilty. . . . If you find that the government has failed to prove beyond a reasonable doubt that each and every element of the offense is met, you should find the defendant not guilty and acquit him on that count.

**5.** The requested charge stated:

> Ladies and Gentlemen of the Jury, I charge you that whether the stun gun in this case was authorized or unauthorized by the Doraville Police Department is not an element of the crime alleged in the indictment and should not be considered in deciding this case.

**6.** At trial, the government introduced into evidence General Order 86–21 of the Doraville Police Department, establishing that the stun gun was not an authorized weapon. In addition, Police Chief Everett and Major Davis testified that they ordered Myers not to use a stun gun.

the defendant utilized reasonable force to accomplish a legitimate law enforcement objective, you must find the defendant not guilty.

This instruction is substantially the same as that proposed by Myers, with the exception that the court did not specify that defendant was entitled to use force in order to fingerprint or photograph a suspect. Moreover, the record shows that Myers did not conduct fingerprinting and/or photographing of the suspects. The court did not err in not giving Myers' proposed jury instruction as to the theory of defense. *See United States v. McEvoy*, 820 F.2d at 1172.

### III. EVIDENTIARY RULINGS

Myers contends that the court erred in making the following evidentiary rulings: 1) not admitting into evidence in its entirety a prior statement by Myers; 2) not admitting into evidence a prior statement of a witness for appellant; 3) allowing three lay witnesses to offer their opinions during their testimonies; 4) limiting the cross-examination of a government witness; and 5) admitting three items of demonstrative and real evidence into evidence.

"A court's evidentiary rulings are discretionary and will not be disturbed on appeal absent a clear showing of an abuse of discretion." *United States v. Pendas–Martinez*, 845 F.2d 938, 941 (11th Cir.1988) (citations omitted).

### A. Myers' Prior Statement

■ The statement at issue is a three-page signed, written statement that Myers made during a police internal affairs investigation on Myers' use of the stun gun on Yanez. The statement first came up at trial during cross-examination of Myers. The prosecution questioned Myers on the contents of his report and about the number of times he activated the stun gun. Myers replied that he activated the stun gun five or six times. The government marked the statement as government's exhibit 9 and provided the statement to Myers to refresh his recollection. The statement specified that Myers had used the stun gun to shock Yanez four times.

On direct examination, Myers had testified that he used the stun gun on Yanez five times. The prosecution used the statement to impeach Myers' testimony regarding the number of times that he used the stun gun on Yanez.

Defense moved for admission of the entire statement. The court refused this request and allowed only portions of the statement that were pertinent to the witness' testimony into evidence. Myers now contends that the court should have admitted the entire statement into evidence, pursuant to Rule 801(d)(1) of the Federal Rules of Evidence, which provides that a prior statement is not hearsay, and thus admissible, if it is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Fed.R.Evid. 801(d)(1)(B).

We find that because the court did admit the statement into evidence, albeit in a redacted form, Rule 801(d)(1)(B) does not support Myers' claim. "[A] trial court has discretion to exclude those parts of prior consistent statements that do not relate specifically to matters on which the defendant has been impeached." *United States v. Brantley*, 733 F.2d 1429, 1438 (11th Cir. 1984), *cert. denied*, 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985). The prosecution introduced into evidence portions of Myers' statement with respect to the number of times that Myers used the stun gun on Yanez; that was the impeachment purpose. Other information provided in the statement concerning the circumstances of Myers' use of the stun gun reflect his motivation and reason for the use of the gun. Myers objects to the jury not receiving information in his statement that described Yanez's threats to the police officers, the state of the stun gun's battery, the reasons why Myers used the stun gun, and what Yanez said before and after Myers used the stun gun on him. Not only were these facts not in dispute, they were testified to by Myers and other witnesses.

Myers also contends that Rule 106 of the Federal Rules of Evidence requires the admission of the entire statement into evi-

dence. Under this "rule of completeness" when a part of a written statement is introduced by a party, the adverse party may require the introduction of any other part of the statement "which ought in fairness to be considered contemporaneously with it." Fed.R.Evid. 106. There are, however, limitations on the rule.

A [ ] limitation on the rule of completeness, applicable in all cases, arises when the prosecution seeks only to introduce a portion of the defendant's statement. There, the defendant still has the right to introduce additional portions of his statement. But, this right does not entitle the defendant to introduce portions of his statement that are neither explanatory of nor relevant to those portions of the statement introduced by the prosecution.

*United States v. Smith,* 794 F.2d 1333, 1335 (8th Cir.) (citing *United States v. Marin,* 669 F.2d 73, 84–85 (2d Cir.1982)), *cert. denied,* 479 U.S. 938, 107 S.Ct. 419, 93 L.Ed.2d 370 (1986). As we have already explained, the prosecution introduced portions of Myers' statement for the purposes of impeaching Myers' testimony regarding the number of times he used the stun gun on Yanez. The information that was redacted from the statement had to do with events that were not pertinent to the impeachment purpose. The court, therefore, did not abuse its discretion in excluding Myers' three-page statement in its entirety. *See United States v. Reed,* 887 F.2d 1398, 1405 (11th Cir.1989) (district court has broad discretion in determining admissibility of prior consistent statement and will not be disturbed on appeal absent a clear showing of abuse of discretion), *cert. denied,* 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990).

### B. Prior Statement of Witness

 Myers contends that the court abused its discretion when it refused to admit a statement that Yanez allegedly made to Officer Bice a few days after the incident giving rise to this action. Myers proffered that Bice would have testified that Yanez told him that, "if it wasn't for the old man (Myers), he would have beaten up the younger radio operator." The court sustained the government's objection to this testimony on the ground that Yanez was not given the opportunity to explain the statement pursuant to Rule 801(d)(1) of the Federal Rules of Evidence.[7]

Myers argues that Bice's testimony regarding Yanez's prior statement would have rebutted Yanez's earlier testimony that he did not try to strike any of the officers. We find that even if the court had committed error, it was harmless. Yanez testified that he challenged various officers to a fight, yelled obscenities, told an officer to take off his badge so that they could fight, and threatened various officers. Even if the court had admitted the statement, it would have added little to Myers' case. In addition, the court's refusal to admit it did not prejudice Myers' case. Myers claims that Bice's testimony was crucial because "no other corroborating witness was called to testify on behalf of the Defendant." The record shows, however, that Myers had called Officer Robert Brown to corroborate his testimony about the Yanez affair. The court did not abuse its discretion in excluding Bice's testimony as to Yanez's statement.

### C. Testimony of three lay witnesses

 Myers contends that the court erred in allowing three lay witnesses, Officers Welch, Baker, and Fleming, to testify as to their opinions. The ultimate decision

---

**7.** Rule 801(d)(1) provides in pertinent part that, A statement is not hearsay if—
(1) **Prior statement by witness.** The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding.

Fed.R.Evid. 801(d)(1)(A). This circuit has interpreted the term "subject to cross-examination" to mean that the witness must be available for recall and not that the witness must first be confronted with the impeaching statement before it could be proved by extrinsic evidence. *See Wammock v. Celotex Corp.,* 793 F.2d 1518, 1521–23 (11th Cir.1986).

as to the admissibility of lay opinion testimony is committed to the sound discretion of the district court and will not be overturned on appeal unless there is clear abuse of discretion. *See United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 184, 93 L.Ed.2d 118 (1986). Rule 701 of the Federal Rules of Evidence permits a lay witness to offer his opinion if it is "rationally based on the perception of the witness and [is] helpful to a clear understanding of [the witness's] testimony or the determination of a fact in issue." Fed.R.Evid. 701.

■ Myers claims that the court should not have allowed Officer Welch to testify as to his opinion that the reddish burn marks on Yanez's back were consistent with marks that would be left by a stun gun on the ground that his testimony went beyond the everyday common knowledge of a lay person. In addition, Myers argues that the proper foundation was not laid for Welch's testimony.

Welch's testimony was relevant to the determination of a fact in issue—whether the burn marks on Yanez's back were caused by the stun gun. His conclusion was rationally based upon his personal perception of Yanez's back and his nineteen years of experience on the police force. To the extent that Welch's opinion lacked a technical/medical basis, Myers had the opportunity to expose this on cross-examination. Myers' objection to the evidence goes to its weight and not to its admissibility. *See Dallis v. Aetna Life Ins. Co.*, 768 F.2d 1303, 1306 (11th Cir.1985). The trial court did not abuse its discretion in admitting this evidence.[8]

■ Myers further contends that the court abused its discretion in allowing Officer Bobby Joe Baker and radio dispatcher Fleming to offer a legal conclusion on the ultimate issue in the case. At trial, Baker testified that "based on [his] knowledge and experience," Myers' use of the stun gun on Yanez did not constitute reasonable force. Fleming testified that "based on what [he] saw" the use of the stun gun against Yanez the fourth and final time was "unjustified."

While asking whether force was "reasonable" or "justified" invades the province of the jury, this circuit has held that, considering the entirety of testimony, an expert witness can testify as to the prevailing standards in the field of law enforcement. *Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir.1990). In *Samples*, this circuit found that the questions leading up to the expert's testimony and the manner in which he answered the question properly informed the jury that the expert was testifying regarding prevailing standards in his field. The defense questioned the expert on the industry standards for judging the appropriate use of force prior to soliciting his opinion as to the reasonableness of the officer's actions. The expert's answer was given in terms of the standards set out by a previous expert witness, which involved a three-pronged inquiry into the subject's ability to harm, his opportunity to harm, and whether someone was in jeopardy of being harmed by the subject at the time the officer used force against the subject. *Id.* at 1551.

In light of the questioning and answers given, we find that, as with the testimony in *Samples*, Baker properly framed his opinion in accordance with prevailing police standards.[9] The court did not err in admit-

---

**8.** Moreover, the court gave the following instruction to the jury:

> Merely because an expert witness has expressed an opinion, however, does not mean that you must accept that opinion. The same as with any other witness, it is up to you to decide whether to rely upon it.

**9.** Baker's examination is provided in pertinent part,

> Q. ... [I]n the training that you have received, when you receive or somebody threat-

ens you verbally, does that justify you using any physical force against them?
A. No, it doesn't.
Q. Does it matter what the nature of the threats are?
A. No.
Q. What is the rule on how you handle people who are being verbally abusive?
A. They teach you in the academy when someone is being real loud and yelling at you, you are supposed to start at their level and work your way down voicewise. So it is

ting his testimony. *See Wade v. Haynes,* 663 F.2d 778, 784 (8th Cir.1981) (holding that question that amounted to an inquiry as to whether "defendant's conduct violated a constitutional norm," was permissible because the "jury had the right to be informed concerning prison policy" in assessing whether a correctional officer had violated a prisoner's civil rights), *aff'd on other grounds,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).

Myers also contends that Baker was not qualified as an expert witness to offer his opinion and that Baker was not experienced enough to evaluate Myers' conduct. A lay witness, however, is not precluded from offering his opinion. *See* Fed.R.Evid. 701. As for Baker's qualifications to judge Myers' use of the stun gun, the jury heard Baker's qualifications and it was up to it to determine his credibility. This objection goes to the weight of the evidence rather than to its admissibility.

 In reviewing Fleming's testimony, we find that a foundation was not laid for his testimony regarding Myers' unjustified use of the stun gun on Yanez. Unlike Baker's testimony, the prosecution did not elicit Fleming's response in the context of the prevailing standards of police behavior. It merely asked, "[b]ased on what you saw, was there anything to justify that use of the stun gun at the end that you were just telling us about?" to which Fleming answered, "[a]t the time I felt it wasn't neces-

sary." This error, however, was harmless in light of the court's instructions to the jury that it was their "duty to decide ... the specific facts," and whether to "accept ... [and] rely upon an expert witness." *See United States v. Carrazana,* 921 F.2d 1557, 1568 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 191, 116 L.Ed.2d 152 (1991).

### D. Limiting Cross–Examination of Government Witness

 Myers contends that the court erred in not allowing him to cross-examine Officer Jett, a government witness, about certain incidents of misconduct in order to show bias. Myers proffers that had the court permitted it, he would have cross-examined Jett regarding the following events that occurred in 1986 when Myers served as watch commander: 1) a complaint filed with the Doraville Police Department against Jett for furnishing alcoholic beverages to two minors; 2) Jett's forced resignation from the Department for leaving work on false pretenses; and 3) after reinstatement to the Department, shooting out a television monitor after mistakenly believing that he had removed all the bullets from his gun.[10] The court ruled that Myers could cross-examine Jett on incidents that showed some connection to Myers that would indicate bias by Jett. The court determined that the mere fact that Jett was disciplined on other occasions

supposedly supposed to bring their voice down with you.

Q. If somebody is voicing obscenities to you, are you supposed to voice obscenities back?

A. No.

Q. And in your experience with dealing with people on the street, your experience both with the Doraville Police and with the other law enforcement experience that you have had, does that rule work on the street when you are dealing with people?

A. Yes, it does.

Q. Are you allowed to exact any physical punishment against anybody for making threats?

A. No, you are not.

Q. What does the use of reasonable force mean?

A. Minimum amount of force necessary to take the person into custody.

Q. Based on your knowledge of the standard and of proper police procedures and behavior back in September of 1989 when you saw Captain Myers shocking Mr. Yanez with the stun gun, in your view was that reasonable force?

[Defense objected on grounds of Rules 611(c) and 701 and was overruled.]

A. No, it wasn't.

10. Myers contends on appeal, for the first time, that the court should have allowed him to cross-examine Jett on 1) an investigation on Jett's use of a nightstick or flashlight on a prisoner; and 2) Myers' role in an investigation on Jett's possession of rented videotapes that were past due. Because he never sought to cross-examine Jett about either of these incidents on trial, Myers is now precluded from raising these claims on appeal. *See United States v. DiPaolo,* 804 F.2d 225, 230 (2d Cir.1986).

was irrelevant.[11] The court did allow the defense during direct examination of Myers to ask questions regarding the incidents to reflect possible bias on the part of Jett.[12]

■ Delineating the scope of cross-examination is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *See United States v. Casamayor,* 837 F.2d 1509, 1514 (11th Cir.1988), *cert. denied,* 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989); *United States v. Orr,* 825 F.2d 1537, 1540 (11th Cir.1987); *United States v. Darwin,* 757 F.2d 1193, 1202 (11th Cir.1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 896, 88 L.Ed.2d 930 (1986). While the Sixth Amendment guarantees a defendant the right to cross-examine witnesses, that right "is not unlimited." *United States v. Alonso,* 740 F.2d 862, 875 (11th Cir.1984), *cert. denied,* 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985); *see also United States v. Calle,* 822 F.2d 1016, 1020 (11th Cir. 1987). There was no abuse of discretion here.

E. Court's Rulings on Demonstrative Evidence

Myers contends that the court erred in: 1) admitting into evidence a photograph of a bunk in a cell at the station; 2) allowing the prosecution to activate the stun gun before the jury; and 3) refusing to permit a tape to be played in its entirety.

■ We find that the court did not abuse its discretion in admitting into evidence a photograph of a bunk in a cell at the Doraville Police Station that was not the actual cell in which Cowan was held. Officer Fleming testified on direct examination that the photograph "fairly and accurately" depicted the bunk on which Mr. Cowan was placed, except that the actual bunk was on the opposite side. Myers argues that the admission of the photograph confused the issue of Cowan's location when the stun gun was used and impaired the cross-examination of Officer Jett and Cowan. Myers could have easily remedied any confusion by reminding the witnesses and jurors that the actual bunk was on the opposite side. Moreover, there was nothing in the record to indicate that the witnesses were confused. There is no basis upon which to find that the court erred in admitting the photograph.

■ Myers next contends that the court erred in allowing the prosecution to activate the stun gun with a fully charged battery before the jury because the battery was weaker when he used the stun gun on Yanez and Cowan. Before the trial commenced, Myers had objected to the demonstration of the stun gun, with a new battery in it, before the jury. The court ruled that it would allow defense counsel to reserve an objection at the time the prosecution wished to demonstrate the stun gun and would then instruct the jury that it was an issue for them to decide. The court did as it promised. When the prosecution demonstrated the use of the stun gun in front of the jury, the court gave the following instruction,

> Members of the jury, in connection with the demonstration, I would advise you or instruct you that it is your duty to determine whether the demonstration accurately reflects the condition of the stun gun on the occasion in question. In that regard, the battery on the stun gun has been recently recharged. But it is an issue for you to determine whether it presently has the—whether it presently operates in the same manner as it did on the date in question.

11. The court explained,

> Had you offered to ask the witness whether he knew of or believed that Captain Myers had instituted any disciplinary investigation that resulted in his being disciplined, I think that may well have been an appropriate question rather than trying to go into the substance of other violations this witness may have been involved in that have nothing to do with this case.

12. The court ruled,

> I am not going to allow you to go into what the incidents may or may not have been. I don't think that has any relevance with regard to Officer Jett's testimony. But, if you can lay the foundation that there was a disciplinary process with regard to Officer Jett, and that Captain Myers participated in that and Officer Jett was aware of that, then I think that would reflect upon the possible bias of the witness.

There was testimony to the effect that the stun gun was not fully charged on the incident dates and that the victims themselves did not react in a normal fashion to application of a fully charged stun gun.

We note first that Myers did not preserve this argument for appeal because defense counsel failed to raise an objection when the prosecution demonstrated the use of the stun gun. At any rate, the court cured any prejudice by instructing the jury as to the factual issue involved.[13] If the court erred, it was harmless. *See United States v. Lang*, 904 F.2d 618, 627 (11th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990); *Robin v. Automatic Fasteners, Inc.*, 672 F.2d 1231, 1239 (5th Cir. Unit B 1982).

■ Myers contends that the court erred by not permitting defense counsel to play a thirty-five minute tape of Cowan in jail in its entirety. The government played a portion of the tape that had Cowan yelling for a doctor and cursing at a female in an adjacent cell. Defense counsel objected and requested that the entire tape be played pursuant to Rule 106 of the Federal Rules of Evidence. The court ruled that Myers could play specific portions of the tape or a representative portion. The rest of the tape depicted Cowan yelling, cursing, and slamming the broken bunk. The purposes of Rule 106 would not have been served by playing the entire tape. Moreover, the court gave defense counsel the opportunity to select portions of the tape to rebut Cowan's testimony that he was docile at the time of the stun gun incident. The court did not abuse its discretion. *See Bury v. Marietta Dodge*, 692 F.2d 1335, 1338 (11th Cir.1982).

The district court judgment is *affirmed.*

---

**13.** We fail to see any merit to Myers' argument that the government's repeated demonstrations of the stun gun before the jury prejudiced the jury and prevented a fair trial because defense counsel activated the stun gun before the jury on numerous occasions. *See, e.g.,* Tr. at 257, 260, 763, 834.