[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 23, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-12764
Non-Argument Calendar

_____

D. C. Docket No. 04-00229-CR-KD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

OSCAR PEREZ-LOPEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(January 23, 2008)**

Before BIRCH, DUBINA and CARNES, Circuit Judges.

PER CURIAM:

Oscar Perez-Lopez appeals his convictions for conspiracy to possess cocaine

with intent to distribute, in violation of 21 U.S.C. § 846, and possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

## I.

On October 30, 2004, Baldwin County Sheriff's Deputy Randy Younce made a traffic stop of a tractor trailer driven by Rudolfo Tobias. Tobias consented to a search of the tractor trailer. Younce initially observed what he believed to be drug paraphernalia and later discovered a hidden compartment under the sleeper cab that contained $456,000 in cash and 439 grams of cocaine.

Tobias first lied about the money and drugs, but eventually cooperated with the police and told them that Perez-Lopez organized the trip and made all of the arrangements. On November 17, 2004, a federal grand jury indicted Tobias and Perez-Lopez for conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2, and possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Tobias agreed to plead guilty to the conspiracy count, and in exchange for his testimony against Perez-Lopez, the government agreed to drop the remaining count and move for a reduced sentence.

At Perez-Lopez's trial, Tobias testified about the terms of his plea agreement. Regarding the drug operation, Tobias testified that he met Perez-Lopez

through his cousin, Isador Reyes, about a week before his arrest. Initially he had told the police that he had been introduced by a person named Eddie, but he later admitted that it was actually his cousin, Reyes. During a meeting outside Perez-Lopez's ranch in Texas, Reyes and Perez-Lopez offered Tobias a job driving a tractor trailer from Texas to Florida. Perez-Lopez explained that Tobias would drive a tractor trailer containing drugs and a legitimate load of limes to Florida—the drugs would be stored in a hidden compartment. When Tobias arrived in Florida, he would contact a person named Burro, at a number provided by Perez-Lopez, to arrange final delivery of the drugs, and once Burro removed the drugs, Tobias would deliver the legitimate load. Perez-Lopez was supposed to pay Tobias for ths trip, but no details about payment were given at that meeting.

Tobias then testified about the details of his trip from Texas to Florida, his meeting with Burro, who arranged for the removal of the drugs, and his delivery of the load of limes. After all this had occurred, Tobias then waited in Florida for Burro to contact him again, and Burro arranged to have the money obtained by the sale of the drugs loaded into the truck's hidden compartment. Once the money was loaded, Tobias drove the tractor trailer toward Mississippi, where he was going to pick up a load of chickens. He was stopped by Deputy Younce while he was traveling through Baldwin County, Alabama.

3

Once he decided to cooperate with police, Tobias: (1) told them where he had picked up the money and that he was headed to Perez-Lopez's ranch in Texas; (2) described the ranch; (3) identified Perez-Lopez in a photo line-up; and (4) provided Perez-Lopez's contact information. Tobias also agreed to place monitored calls to Perez-Lopez so he could make an excuse for the delay (which was actually caused by his arrest) and the agents could hear that Perez-Lopez knew about the money. In one of the calls, Perez-Lopez told Tobias he could take some of the money in the hidden compartment to pay for repairs on the truck.

Before cross-examination, in a conference outside the presence of the jury, counsel for Perez-Lopez told the district court that Tobias had identified "Eddie" as Reyes for the first time at trial and this information had not been provided in discovery. Counsel had a copy of Tobias' plea agreement, and its factual recital named Eddie, not Reyes. He requested access to Tobias' presentence investigation report to determine if, at that point, Tobias had admitted that it was Reyes, not a fictional Eddie, who introduced him to Perez-Lopez, and, if not, to use the PSR for impeachment purposes. The government stated that it could not say with certainty when Tobias admitted the falsehood because the original case agent no longer worked with the sheriff's office, had not documented all the interviews, and the only written report about the interviews was turned over to the defense. The

4

government believed that it had discovered this information before Tobias' sentence hearing, but it had no documentation to show that. The district court ruled that Perez-Lopez could use the factual recital from Tobias' plea agreement to impeach him, but he could not use the PSR because it was sealed and Tobias did not sign anything agreeing to its accuracy.

On cross-examination, Tobias admitted, among other things, that he originally lied to the agents about the existence of Eddie, but he thought that he had told them the truth about Eddie on the night of his arrest. After further questioning, he stated that he was not sure about the date, but he knew he had told the truth at some point.

The government also presented the testimony of a number of other witnesses, including Drug Enforcement Administration agent Michael Lumpkin, who worked in the agency's Texas office and had been given the information Tobias provided about Perez-Lopez's ranch. On October 31, 2004, Lumpkin took pictures of a ranch just east of Edinburg, Texas, which agents confirmed was owned by Perez-Lopez and his wife, Lorena Perez. While monitoring the ranch, Lumpkin followed an Expedition, which was registered to Perez-Lopez and his wife, as it left the ranch, was driven through several cities, and then was driven back to the ranch. Lumpkin described the vehicle's course of action as "heat runs

or checking to see if it was being followed by law enforcement."

Perez-Lopez objected to Lumpkin's testimony about "heat runs" because Lumpkin had not been qualified as an expert witness, and the government had failed to provide notice that he was going to testify about surveillance techniques as an expert witness. The government explained that it was only asking Agent Lumpkin to describe his observations, and the district court overruled Perez Lopez's objection. Lumpkin then testified that the vehicle pulled into cul-de-sacs and drove around the city without stopping at any particular location before returning to the ranch. On November 12, 2004, the agents executed a search warrant at the ranch, in which they recovered a T-mobile bill for the telephone used by Tobias, Tobias' marriage license, and Perez-Lopez's financial records. The search did not yield any drugs or money.

The government also called Sharon Murphy, an agent with Immigration and Customs Enforcement, who testified about her involvement in the investigation. She told about the phone records of Tobias and Perez-Lopez. Tobias had a number labeled as "Burro" in his phone, which was called many times between October 25 and October 28, 2004. When the government asked Murphy if she was aware that an investigation had been initiated with regards to Burro, Perez-Lopez objected to the testimony as irrelevant because it concerned an independent investigation of

6

someone other than Perez-Lopez. He also objected that the question called for inadmissible hearsay in the form of statements by other DEA agents telling Murphy that they were investigating Burro. The district court ruled that the testimony was relevant because Burro was alleged to be a conspirator in the case, and that it was not hearsay as long as Murphy refrained from stating what other agents had told her. Murphy testified that: (1) the agents in Texas, Alabama, and Florida were conducting a coordinated investigation into the drug conspiracy; (2) the agencies initiated an investigation aimed at identifying Burro and others connected to Tobias; and (3) the individual associated with the Burro phone number had been identified, but the investigation was still ongoing. Murphy also testified that at some point in the investigation, Tobias had implicated Reyes as the person who introduced him to Perez-Lopez.

At the close of the government's case, the district court denied Perez-Lopez's motion for judgment of acquittal. Perez-Lopez recalled Tobias, and then testified on his own behalf. After both sides rested, the court submitted the case to the jury. The jury convicted Perez-Lopez on all counts, and the district court sentenced him to 300 months imprisonment on the conspiracy count and 240 months imprisonment on the possession with intent to distribute count, to be served concurrently.

Perez-Lopez timely appealed, and he contends that the district court erred by: (1) allowing Agent Lumpkin to testify about "heat runs" without qualifying the agent as an expert on counter-surveillance and even though the government had failed to provide Perez-Lopez with notice of the expert testimony; (2) admitting testimony about the investigation of Burro because it was irrelevant, inadmissible hearsay, its admission violated his Sixth Amendment Confrontation Clause rights, and it was "amorphous bad character evidence;" and (3) declining to order the government to turn over any information concerning when Tobias informed the agents that the individual who introduced him to Perez-Lopez was his cousin, Reyes. Perez-Lopez also contends that, when coupled together, the cumulative effect of the individual errors deprived him of a fair trial.

## II.

Perez-Lopez first contends that the district court abused its discretion by admitting Agent Lumpkin's testimony about "heat runs" because he had not been qualified as an expert in surveillance, and Perez-Lopez had not received advance notice of the expert testimony as required by Federal Rule of Criminal Procedure 16. We review rulings made under Rule 701 of the Federal Rules of Evidence only for an abuse of discretion. United States v. Myers, 972 F.2d 1566, 1576–77 (11th Cir. 1992).

8

Rule 701 governs the testimony of "lay" witnesses. It provides that the testimony of a witness who is not testifying as an expert, "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

We have explained that in order to be rationally based on the perception of the witness, the testimony must be "based on first-hand knowledge or observation." United States v. Marshall, 173 F.3d 1312, 1315 (11th Cir. 1999). The witness's perception, however, may be interpreted in light of his experience. See Myers, 972 F.2d at 1577 (stating that a police officer could testify that burn marks on the skin were caused by a stun gun where the opinion was based on the officer's personal perceptions of the marks and his experience on the police force). We have rejected the argument that simply because a police officer testifies to an opinion based in part on his past experiences, his testimony should not be admitted under Rule 701. United States v. Novaton, 271 F.3d 968, 1008 (11th Cir. 2001).

Rule 702 governs the testimony of expert witnesses. See Fed. R. Evid. 702. When the district court admits a witness's testimony under Rule 702 rather than as a lay opinion under Rule 701, the provisions of Federal Rule of Criminal

Procedure 16 apply. According to Rule 16, at the defendant's request, the government must provide before trial a written summary of expert witness testimony, including "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G).

The district court did not abuse its discretion in admitting Agent Lumpkin's testimony under Federal Rule of Evidence 701 because his opinion that the vehicle he observed was conducting a "heat run," or "checking to see if it was being followed," was based on his personal observations of the vehicle and his past experience as a DEA agent. Just as the district court in Myers did not abuse its discretion by admitting under Rule 701 an officer's testimony that the burn marks on a person's skin were the result of a stun gun based on the officer's personal observations of the marks and his past experience as a police officer, see Myers, 972 F.2d at 1577, the district court here did not abuse its discretion by admitting under Rule 701 Lumpkin's testimony about "heat runs" based on his personal observations of the Expedition and his past experience as a DEA agent. Because Lumpkin provided a lay opinion, Perez-Lopez's discovery argument under Federal Rule of Criminal Procedure 16, which only applies to expert testimony, lacks merit.

## III.

Perez-Lopez next contends that the district court abused its discretion by allowing Agent Murphy to testify about the investigation of Burro in Florida because, as he argued before the district court, it was irrelevant, inadmissible hearsay. Perez-Lopez also argues for the first time on appeal that the evidence was inadmissible as "amorphous bad character evidence" under Federal Rule of Evidence 404(b), and that the admission of this testimony violated his rights under the Sixth Amendment Confrontation Clause.

### A.

We review evidentiary rulings only for an abuse of discretion. United States v. Baker, 432 F.3d 1189, 1202 (11th Cir. 2005). The district court abuses its discretion when its "decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." Id. "Even if an abuse of discretion is shown, nonconstitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected." United States v. Malol, 476 F.3d 1283, 1291 (11th Cir. 2007) (quotations omitted). Reversal is not warranted "where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict." United States v. Arbolaez, 450 F.3d 1283, 1290 (11th Cir.

2006).

The Federal Rules of Evidence provide that only relevant evidence is admissible. Fed. R. Evid. 402. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

The district court did not abuse its discretion by concluding that Agent Murphy's testimony about the investigation of Burro was relevant. The government had already provided evidence that Tobias had delivered drugs to a man named Burro in Florida, that Perez-Lopez had given him a phone number for Burro, and that Tobias had contacted Burro at that number several times between October 25 and October 28, 2004. The fact that the DEA was conducting an ongoing investigation of Burro in Florida was relevant to the scope and existence of the overall conspiracy and corroborated the other evidence presented by the government.

The district court also did not abuse its discretion by concluding that Agent Murphy's testimony was not hearsay. Under Federal Rule of Evidence 801, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

12

asserted." Fed. R. Evid. 801(c).  Subject to certain exceptions, hearsay is not admissible at trial.  See Fed. R. Evid. 802.

Agent Murphy testified that there was a coordinated investigation occurring in Texas, Alabama, and Florida, and that she was aware that Burro had been identified as part of the ongoing investigation into the charged conspiracy.  Her testimony did not include any statements from other agents, and it appears to have been based on her personal participation in the coordinated investigation of the conspiracy.  A witness's testimony at trial based on her personal observations, which does not include out-of-court statements, is not hearsay.  See Fed. R. Evid. 801(c).

### B.

Perez-Lopez argues for the first time on appeal that admission of the evidence about the investigation of Burro violated his Sixth Amendment Confrontation Clause rights.  We review a claim of error raised for the first time on appeal only for plain error.  Baker, 432 F.3d at 1202–03, 1206.  Plain error exists where (1) there is an error; (2) the error is plain or obvious; and (3) the error affects the defendant's substantial rights.  United States v. Olano, 507 U.S. 725, 732–34, 113 S. Ct. 1770, 1776–78 (1993).  When these three factors are met, we may then exercise our discretion and correct the error only if it seriously affects the fairness,

13

integrity, or public reputation of judicial proceedings.  Id. at 732, 113 S. Ct. at 1776.  Whether the error affected a defendants's substantial rights hinges on whether the error affected the outcome of the proceeding.  Arbolaez, 450 F.3d at 1291.

"The Confrontation Clause of the Sixth Amendment guarantees criminal defendants an opportunity to impeach through cross-examination the testimony of adverse witnesses."  United States v. Ariaz-Izquierdo, 449 F.3d 1168, 1178 (11th Cir. 2006), cert. denied, 127 S. Ct. 1041 (2007).  The Confrontation Clause forbids the introduction of testimonial hearsay evidence at trial, unless:  (1) the declarant is unavailable; and (2) the defendant had a prior opportunity to cross-examine the declarant.  Crawford v. Washington, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004).

There was no error, much less plain error.  The district court did not violate Perez-Lopez's Confrontation Clause rights by admitting Agent Murphy's testimony that Burro, an unindicted co-conspirator, was under investigation because the testimony was based on her personal knowledge and was not hearsay. Moreover, Perez-Lopez was given an opportunity to fully cross-examine Murphy about the investigation during the trial, and therefore his Confrontation Clause rights were not violated.

C.

Perez-Lopez also argues for the first time on appeal that the evidence about the investigation of Burro constituted improper character evidence, in violation of Federal Rule of Evidence 404(b). As with Perez-Lopez's Confrontation Clause argument, we also review this argument only for plain error. Baker, 432 F.3d at 1202–03, 1206.

Rule 404(b) forbids the admission of any evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). However, such evidence "may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id.

Perez-Lopez's argument that the testimony was inadmissible character evidence is meritless. As mentioned above, Agent Murphy's testimony related to an investigation of Burro regarding the underlying crime at issue under the charged conspiracy. There was no reference to any "other crimes, wrongs, or acts" committed by Perez-Lopez, or to his character. See Fed. R. Evid. 404(b). Rule 404(b) does not apply.

**IV.**

Perez-Lopez next contends that the district court erred in declining to order

the government to turn over information about when Tobias informed the agents that the individual who introduced him to Perez-Lopez was his cousin, Reyes. Perez-Lopez argues that the information, including Tobias' presentence investigation report, was necessary for his attack on Tobias' credibility, which he argues was the central issue of the case.

We review de novo whether a violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), occurred below. United States v. Schlei, 122 F.3d 944, 989 (11th Cir. 1997). Upon request, the government has a duty to reveal any "evidence [that] is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S. Ct. at 1196–97. This duty covers "[i]mpeachment evidence . . . as well as exculpatory evidence." United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985). The government violates a defendant's constitutional right to due process when it suppresses requested evidence that is favorable to the accused and the suppressed evidence is material. United States v. Perez, 473 F.3d 1147, 1150 (11th Cir. 2006), cert. denied, 127 S. Ct. 2147 (2007).

In order to establish constitutional error under Brady, a defendant must show "(1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant did not possess the evidence nor

16

could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been revealed to the defense, there is a reasonable probability that the outcome of the proceedings would have been different." Id. "Within the possession, custody, or control of the government does not include possession of a federal court or probation officer." United States v. Brazel, 102 F.3d 1120, 1150 (11th Cir. 1997) (citation omitted); see also United States v. Trevino, 556 F.2d 1265, 1270–71 (5th Cir. 1977) (holding that a PSR generally is not considered to be in the government's possession for purposes of Brady material).[1]

Perez-Lopez's argument is without merit because the record shows that documents containing the information he sought either did not exist because of the poor recordkeeping by the original case officer, or, in the case of Tobias' PSR, the document was not in the possession of the government for the purposes of Brady. Moreover, Perez-Lopez cannot show that there is a reasonable probability that, had the evidence been disclosed, the outcome of the trial would have been different. He presented much the same information through other evidence, including Tobias' and Agent Murphy's testimony, and he effectively impeached Tobias

---

[1] In our en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

using other evidence, such as the factual recitation in his plea agreement. Accordingly, there was no Brady violation here.

## V.

Perez-Lopez finally contends that when coupled together, the cumulative effect of the individual errors deprived him of a fair trial. We address a claim of cumulative error by first considering the validity of each claim individually. United States v. Calderon, 127 F.3d 1314, 1333 (11th Cir. 1997). We then examine the evidentiary errors in the aggregate and the trial "as a whole to determine whether the appellant was afforded a fundamentally fair trial." Id. We will reverse if the cumulative effect is prejudicial, even if each individual error was harmless. Baker, 432 F.3d at 1203. However, where there is no error or only a single error, there can be no cumulative error. United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004).

Because the district court did not commit any individual errors, there cannot be any cumulative prejudicial error.

**AFFIRMED.**