**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Edward Alois WALTHER a/k/a "Eddie," John H. Woodruff, Marvin Walkenstein, John Paul Weger a/k/a "Butch," Defendants–Appellants.**

No. 87–3631.

United States Court of Appeals,
Eleventh Circuit.

March 16, 1989.

Joel Kaplan, Miami, Fla., for Walther.

David T. Weisbrod, Tampa, Fla., for Woodruff.

Jack T. Edmund, Fort Meade, Fla., for Weger & Walkerstein.

Mark V. Jackowski, Whitney L. Schmidt, Asst. U.S. Attys., Tampa, Fla., Marvin Hamburg, Dept. of Justice, Washington, D.C., for U.S.

Before JOHNSON, HATCHETT and COX, Circuit Judges.

HATCHETT, Circuit Judge.

In this "reverse sting" marijuana distribution case, we affirm the convictions and judgments.

## FACTS

On October 13, 1986, a confidential informant (CI) advised officers from the Polk County, Florida, Sheriff's Department that individuals from Miami, Florida, were interested in purchasing narcotics. During the next two weeks, the officers devised a plan whereby they would pose as marijuana traffickers with a ready supply of marijuana for immediate sale. In this type of undercover narcotics operation, known as a "reverse sting," undercover law enforcement officers pose as sellers of previously confiscated drugs, set up deals with would-be buyers under carefully controlled conditions, and arrest the purchasers following the sale.

The officers borrowed 3,000 pounds of marijuana from the United States Customs Service and rented two sites, a warehouse-office in Auburndale, Florida, and a warehouse in Lakeland, Florida. The officers installed videotape equipment and hidden microphones in both locations and stored the marijuana in the Lakeland warehouse.

On October 27, 1986, undercover officer William Warnock met the CI and appellants Edward Alois Walther and John H. Woodruff at a shopping center. Warnock drove Walther, Woodruff, and the CI to the Auburndale warehouse to meet undercover officer Jose Davila, who posed as the head of the narcotics trafficking organization. At the warehouse, Walther and Woodruff discussed purchasing 10,000 pounds of marijuana from Davila, but agreed to purchase only 3,000 pounds during the first transaction.

Davila dispatched Warnock to bring a sample bale of the marijuana to the Au-

burndale warehouse. While waiting for Warnock to return, Davila, Walther, and Woodruff discussed arrangements for removing the marijuana from its storage facility. Davila set the price at $315 per pound. After Warnock returned with a sample bale, Walther examined it by inserting his hand into the bale to test the marijuana for wetness. Upon removing a small quantity for inspection, he rolled a marijuana cigarette and smoked it.

Davila told Walther and Woodruff that he needed forty-eight hours to prepare for the sale. Davila gave Walther and Woodruff his beeper number and concluded the meeting. Warnock drove Walther, Woodruff and the CI back to the shopping center.

On October 28, 1986, Woodruff telephoned Davila's beeper number from Miami, and Davila returned the call. Woodruff told Davila that he and Walther were flying to Orlando, Florida, and would arrive at 9:30 a.m. on October 29, 1986. Woodruff also stated that he had already dispatched several vehicles to Polk County. Davila told Woodruff that he and Warnock would meet them at the airport.

On October 29, 1986, Davila and Warnock drove to the Orlando airport and joined Walther and Woodruff for a breakfast meeting. Davila stated that the forty-eight hours needed to make proper arrangements had not expired and that his associates had not yet located a satisfactory warehouse for storing and distributing the 3,000 pounds of marijuana. Walther told the officers that his flight bag contained enough money to buy 400 pounds of marijuana. Walther explained that they had a car in the airport parking area with out-of-state plates equipped with air shock absorbers capable of carrying a 300 or 400 pound load smoothly. Davila replied that he was not interested in selling only 400 pounds. He added that he would make arrangements for his driver, Warnock, to meet them on October 30, 1986, and take them to his office to complete their negotiations. Later that day, Woodruff notified Davila that he and Walther were staying in room 203A at the Howard Johnson motel.

Davila told Woodruff that Warnock would meet them at noon on October 30, 1986.

On the morning of October 30, 1986, Warnock drove to the Howard Johnson motel and met Walther and Woodruff. Each entered a separate car: Walther drove a Ford; Woodruff drove a Chevrolet Caprice with a Missouri license plate. Walther and Woodruff followed Warnock on a circuitous route to the shopping center where they had met three days before. Walther and Woodruff entered Warnock's car and accompanied him to the Auburndale warehouse to meet Davila. The activities in the Auburndale warehouse were recorded.

Davila told Walther and Woodruff that the 3,000 pound load of marijuana had been delivered to a different warehouse. Woodruff stated that Walther had the purchase money. Walther indicated, however, that he did not have all of the money. Walther asked to examine the 3,000 pounds of marijuana and indicated that he and others would repack the marijuana and place 400 pounds in one of the cars parked at the shopping center. Woodruff advised Davila that he had to contact persons in Miami because the trucks were still in Miami, and they could repack the load while waiting for the trucks to arrive. When Woodruff asked whether the storage area had security problems, Davila responded that he knew of none. Davila directed undercover officer Frank Hart to drive Woodruff to the warehouse in Lakeland.

After Woodruff left, Walther noted that the sample bale had contained two brick-shaped packages and asked whether the bales generally looked that way. When told that they did, Walther declared that repackaging was necessary. When Woodruff returned, he praised the location of the Lakeland warehouse and reported that he had examined the marijuana.

The parties agreed that the repackaging activity could commence prior to payment as long as the money was delivered before the marijuana left the warehouse. Davila assigned Warnock to meet Walther at the Howard Johnson motel and bring him to the Auburndale warehouse after Walther had obtained all of the money. At 3:30

p.m., Warnock drove Walther and Woodruff back to the shopping center where they had left their cars. Warnock agreed to meet them early the next morning.

At 8:15 p.m. that evening, Hart arrived at the Lakeland warehouse with Walther, Woodruff, and appellants John Paul Weger and Marvin Walkenstein. Undercover officers Robert Kenney and Roy Annen were inside the warehouse, purporting to serve as guards. Earlier that day, Kenney had driven a truck containing almost 3,000 pounds of marijuana to the warehouse.

After introducing themselves as Eddie (Walther), Johnny (Woodruff), "Butch" (Weger), and Marvin (Walkenstein), the appellants set about repacking and weighing the marijuana. Appellants began by unloading a trash can, garbage bags, gloves, coveralls, duct tape, cutting knives, and other items. Weger issued directions to the other three appellants. They placed two trash bags, one inside the other, into the trash can. The first bale removed from the truck contained two compressed bricks of marijuana wrapped in burlap and plastic. Appellants removed one brick and placed it in the trash can; then appellants twisted and secured the inside bag and the outer bag with duct tape. Appellants weighed the bag, numbered it, and recorded the weight on a piece of duct tape on the outer bag. Appellants repeated that process with each act of repackaging. In addition, appellants kept a running account of the number of bags and their weights, deducted the weight of the bags, and placed the bags containing wet marijuana aside.

For approximately one hour, all four appellants participated in the repackaging and weighing process. Then Walther and Weger drove off, leaving Woodruff and Walkenstein to complete the repackaging, weighing, and recording. On four occasions while pausing from their work, Walkenstein smoked some of the marijuana.

At 6 a.m. on October 31, 1986, Warnock met Walther in the lobby of the Howard Johnson motel and followed him to room 203A. Walther emerged from the room with a heavy suitcase, and Warnock placed it in the trunk of his car. Walther carried a second suitcase and his flight bag. Warnock drove Walther to the Auburndale warehouse to meet Davila. In the warehouse, the suitcases and the flight bag were opened and Walther removed stacks of money totalling $949,840.

Woodruff and Walkenstein completed the repackaging early that morning. Hart took Woodruff to the Auburndale warehouse. Woodruff displayed his tally sheets and announced that they had computed the net weight of the marijuana at 2,813 pounds, including 1,037 pounds of wet marijuana. Walther and Woodruff sought a reduction in the price for the wet marijuana because they did not want to pay for the added weight caused by moisture. Davila accepted a price reduction to $290 per pound for the wet marijuana. Walther calculated the total price for 1,776 pounds of marijuana at $315 per pound and 1,037 pounds of wet marijuana at $290 per pound at $860,170. Woodruff stated that Walkenstein would drive off part of the load and then contact Weger who would arrive with the trucks to transport the remainder of the marijuana.

Woodruff returned to the Lakeland warehouse and placed approximately 400 pounds of marijuana in the trunk of the Caprice. Satisfied with its appearance, Walkenstein departed. Walther remained at the Auburndale warehouse to count the cash and make payment for the marijuana.

Walkenstein drove the Caprice only a short distance before officers stopped and arrested him. A search of the vehicle uncovered a purse containing a number of items, including a list of expenses incurred by Walkenstein from October 28 to October 31, 1986, and a boarding pass for a flight from San Francisco, California, to Kansas City, Missouri, on October 16, 1986. The officers seized fourteen bags of marijuana. Officers arrested Walther at the Auburndale warehouse and found a key for room 203A of the Howard Johnson motel on his person. Officers arrested Woodruff at the Lakeland warehouse. Officers arrested Weger in a hotel room near the Howard Johnson motel in which Walther and Woodruff had stayed. In the room officers

found a hotel bill in the name of Marvin Walther.

After checking the registration of the Caprice, officers learned that in January, 1986, the car had been sold by a dealer in Kansas City, Missouri, to someone who called himself "David Miller," and that "Miller" provided a fictitious address to the seller and to the titling authority.

## PROCEDURAL HISTORY

The grand jury charged the appellants in a two-count indictment. Count I charged that the appellants attempted to possess approximately 2,900 pounds of marijuana with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2. Count II charged that the appellants conspired to possess marijuana with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

During the jury trial, neither Weger nor Walkenstein summoned any witnesses or took the stand to testify on their own behalf. Woodruff and Walther claimed entrapment and testified in support of their defense. The jury found the appellants guilty of attempting (Count I) and conspiracy (Count II) to possess marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2. The district court sentenced Walther, Woodruff, and Walkenstein to concurrent terms of imprisonment for ten years and concurrent five-year periods of supervised release. The district court sentenced Weger to imprisonment for twelve years and a five-year supervised release period on each count, to run concurrently.

## CONTENTIONS

Many of the appellants' contentions overlap. They contend that the government's deep involvement in securing large amounts of marijuana and offering it for sale violates due process because it constitutes outrageous and unconscionable government involvement in criminal activity. Appellants also contend that this court should apply *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) retroactively to this case. The government counters that the appellants' case and *Mathews v. United States* are distinguishable and that *Mathews v. United States* is inapplicable. Appellants further contend that the district court erred in: (1) allowing the prosecutor's opening statement; (2) refusing to give supplemental instructions on the entrapment defense; (3) allowing prior criminal conduct to be elicited on cross-examination; and (4) allowing government witnesses to explain why the CI and undercover agents were not depicted on the videotapes and why copies of the videotapes were not distributed to defense counsel.

## ISSUES

We consider the following issues on appeal:

(1) whether the government's reverse sting operation constituted outrageous conduct which violates due process;

(2) whether *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) should be applied retroactively;

(3) whether the district court erred in allowing the prosecutor's opening statement;

(4) whether the district court erred in refusing to give supplemental instructions on the entrapment defense;

(5) whether the district court erred in allowing prior criminal conduct to be elicited during cross-examination; and

(6) whether the district court erred in allowing government witnesses to explain why the CI and the undercover agents were not depicted on the Auburndale videotapes and why multiple copies of the videotapes were not distributed to the appellants' counsel.

## DISCUSSION

I. *The Reverse Sting*

■ Appellants contend that the government's conduct in regard to the reverse sting, i.e. initiating the negotiations, providing the location for the transaction, providing the transportation for the narcotics,

and supplying the narcotics, was so outrageous and unconscionable that it violated their due process rights.

Although a conviction may be overturned where government involvement in criminal activities is so extensive that it may be characterized as outrageous, government involvement in criminal activities is constitutionally impermissible only where it violates fundamental fairness and shocks the universal cause of justice. *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *Owen v. Wainwright*, 806 F.2d 1519, 1521 (11th Cir.1986). Appellants must show extreme circumstances of outrageous government conduct to establish a due process violation. Challenges to the reverse sting method of police investigation have been rejected by this court on numerous occasions. *Owen v. Wainwright*, 806 F.2d at 1522. *See United States v. Savage*, 701 F.2d 867, 869–70 (11th Cir.1983); *United States v. Gianni*, 678 F.2d 956, 960 (11th Cir.1982). When reviewed in light of the aforementioned precedent, the appellants' assertion of outrageous conduct in this case is meritless. The investigation in this case neither violates fundamental fairness nor shocks the universal cause of justice. Accordingly, we hold that the government's activities did not constitute outrageous or constitutionally impermissible conduct.

## II. *Mathews v. United States*

■ Walther and Woodruff contend that we should retroactively apply the rule of *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) and order a new trial. They contend that they were forced to admit all of the criminal acts at their trial in order to pursue the entrapment defense, in contravention of the rule in *Mathews v. United States*. They predict that in a retrial, they would have the opportunity to refrain from those admissions, and thereby increase the likelihood of receiving a jury verdict of not guilty.

The government contends that *Mathews v. United States* is distinguishable from this case, thereby negating the issue of its retroactive application.

Prior to *Mathews v. United States*, we did not permit a defendant who wished to assert an entrapment defense to rely on other defenses that conflicted with the claim of entrapment. Although the defendant could assert inconsistent defenses in other contexts, the unusual nature of the entrapment defense, which focuses on the defendant's predisposition, i.e., the state of mind prior to commission of the offense, justified the requirement. *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

In *Mathews v. United States*, the Supreme Court held that even when the defendant denied one or more elements of the offense, the defendant is still entitled to an entrapment instruction whenever sufficient evidence exists from which a reasonable jury could find entrapment. The *Mathews* Court noted that a valid entrapment defense had two related elements, government inducement of the crime and a lack of predisposition on the part of the defendant to engage in the criminal conduct. The Court explained that predisposition, the principal element in the defense of entrapment, focused upon whether the defendant was an unwary innocent person or instead an unwary criminal who readily availed himself of the opportunity to perpetuate the crime. The *Mathews* Court noted that the question of entrapment is generally one for the jury, rather than for the court.

In this case, we need not determine whether *Mathews v. United States* should be applied retroactively because the facts of *Mathews* are distinguishable. In *Mathews*, the district court refused to instruct the jury on entrapment. The district court ruled that the entrapment defense was not available to Mathews because he would not admit all of the elements of the offense charged. *Mathews v. United States*, 108 S.Ct. at 885–86. In this case, the district court gave an elaborate instruction on the

entrapment defense:[1] Unlike the district court in *Mathews v. United States*, the district court here made the entrapment defense available to appellants. The jury decided that it was inapplicable. Accordingly, we need not apply the rule retroactively.

### III. *Trial Error*

Appellants also contend that the district court erred in: (1) allowing the prosecutor's opening statement; (2) refusing to give supplemental instructions on the entrapment defense; (3) allowing evidence of prior criminal conduct elicited during cross-examination; and (4) allowing government witnesses to explain why undercover agents were not depicted on the videotapes and why copies of the videotapes were not distributed to defense counsel.

### A. Prosecutor's Opening Statement

■ Appellants contend that the district court committed reversible error when it failed to restrain the prosecutor from using the opening statement to prejudice the minds of the jurors against them.[2] Appellants argue that the prosecutor's opening statement poisoned the minds of the jury because he urged them, prior to the introduction of any evidence, to return a verdict of guilty, telling them that such a verdict would be the right verdict for the right reasons.

The government contends that the prosecutor's opening statement contained no

1. The instruction stated:

   The defendant asserts that he was a victim of entrapment concerning the offense charged in the indictment. A person is 'entrapped' when he is induced or persuaded by law enforcement officers or their agents to commit a crime that he had no previous intent to commit; and the law as a matter of policy forbids his conviction in such a case.

   However, there is no entrapment where a defendant is ready and willing to break the law and the government agents merely provide what appears to be a favorable opportunity for the defendant to commit the crime. For example, it is not entrapment for a government agent to pretend to be someone else and to offer, either directly or through an informer or other decoy, to engage in an unlawful transaction with the defendant. So, a defendant would not be a victim of entrapment if you should find, beyond a reasonable doubt, that the defendant was ready, willing and able to commit the crime charged in the indictment whenever opportunity was afforded, and that government officers or their agents did no more than offer an opportunity.

   On the other hand, if the evidence in the case leaves you with a reasonable doubt whether the defendant had any intent to commit the crime except for inducement or persuasion on the part of some government officer or agent, then it is your duty to find the defendant not guilty.

2. Appellants contest the following portion of the prosecutor's opening statement:

   MR. SCHMIDT [Prosecutor]: Now, you jurors—all of you at the conclusion of this case will speak with a single voice—really represent the voice and conscience of our community. And when you render a decision in this case, after hearing and thinking about the testimony and exhibits, you will speak not just for yourself, but you will have the opportunity to speak for justice and the community.

   It is very important to people of the United States that each of these defendants, Butch Weger, Edward Walther, John Woodruff, and Marvin Walkenstein—

   MR. EDMUND [Defense Counsel]: Your Honor, if it please the court, we're getting into the area of argument.

   THE COURT: All right. I'll sustain that objection. I think that's argumentative in tone, Mr. Schmidt.

   MR. SCHMIDT: It is important to the government that everyone receive a fair trial, because it is in the last analysis that it is only in courtrooms like this and in trials like this that the mandate of the people of the United States against drug dealing—

   MR. ALCOTT [Defense Counsel]: Your Honor, on behalf of Mr. Woodruff I again object to the argument of counsel, that he is making.

   THE COURT: I overrule that objection. I take it you are concluding your remarks, Mr. Schmidt?

   MR. SCHMIDT: Yes, Judge Hodges.

   THE COURT: Go ahead.

   MR. SCHMIDT: That the mandate of the people of the United States against drug dealing is finally enforced.

   I will have the opportunity to speak with you again at the end of the case before you decide it in what is known as the closing statements. I will at that time ask you to return a verdict of guilty, finding each of the four defendants guilty as to both charges set forth in the indictment. I will then explain to you why it is important to the people of the United States that that be the right verdict for the right reasons. If you do that, you will have given all of the defendants a fair trial and justice will have been done.

   Thank you very much.

comments constituting reversible error. The government argues that the prosecutor offered no personal opinions of guilt, did not refer to matters outside the record, used no inflammatory language, and did not impinge upon appellants' right not to testify. Instead, the government argues that the prosecutor characterized the jury as reflecting the conscience of the community, and told them that at the end of the case he would ask for a guilty verdict and explain why it was important "that that be the right verdict for the right reasons." The government argues that no error exists because the abundance of evidence established the appellants' guilt; three weeks passed between the opening remarks and the beginning of jury deliberations; and the trial judge issued instructions that the lawyers' comments are not evidence at the outset and at the close of the trial.

██ The test for determining the existence of prosecutorial misconduct is whether the remarks were improper and prejudicially affected the substantial rights of the defendants. *United States v. Lacayo,* 758 F.2d 1559, 1565 (11th Cir.1985); *United States v. Zielie,* 734 F.2d 1447, 1460 (11th Cir.1984). We find that the prosecutor's remarks were neither improper nor prejudicial to the appellants' substantial rights.[3]

### B. Supplemental Instruction on the Entrapment Defense

██ At the close of the trial, the district court instructed the jury pursuant to the Eleventh Circuit pattern jury instruction on the entrapment defense. During deliberations, the jury sent a question regarding the correct allocation of the burden of proof in determining the entrapment defense. Over the objections of defense counsel, the district court instructed the jury to review its original instructions. Appellants contend that the district court's failure to give a supplemental instruction on the entrapment defense constituted reversible error. Appellants argue that the district court erroneously referred the jury

to the very instruction which confused it in the first instance.

The government argues that the entrapment instructions given were accurate.

██ The extent and character of supplemental instructions are within the sound discretion of the trial court. *United States v. Parr,* 716 F.2d 796, 808 (11th Cir.1983). The appellants did not object to the original instructions. At oral argument, appellants admitted that the original instructions were proper. Merely having the jury reconsider the correct instruction cannot constitute error, nor an abuse of discretion. Accordingly, we hold that the district court did not err nor abuse its discretion in refusing to give a supplemental instruction on the entrapment defense.

### C. Cross–Examination on Extrinsic Acts of Misconduct

#### 1. *Walther*

Walther contends that the district court committed reversible error by permitting the government to improperly introduce into evidence, through his cross-examination, unsubstantiated allegations and innuendos of his involvement in prior criminal acts. Walther argues that the government attempted to diminish his credibility by insinuating that he had previously participated in narcotic activities with Woodruff and by asserting through innuendo his membership in the drug underworld.

#### 2. *Woodruff*

Woodruff contends that the district court committed error in allowing the introduction into evidence of his alleged involvement in prior criminal acts. Woodruff argues that the government may not "parade past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo." *Huddleston v. United States,* —— U.S. ——, ——, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771, 782

---

**3.** As to the comments not objected to, we decline review under the plain error standard. *See United States v. Sawyer,* 799 F.2d 1494, 1507 (11th Cir.1986) (in a case involving prosecutorial misconduct, the plain error rule should be used sparingly and invoked only when a review of the entire record convinces the court that "a miscarriage of justice would otherwise result").

(1988). Woodruff contends that a prosecutor must back up his allegations and innuendo employed during cross-examination with substantive evidence introduced on rebuttal. The failure to do so, he argues, runs afoul of Fed.R.Evid. 404(b).[4]

### 3. *Weger and Walkenstein*

Weger and Walkenstein contend that the district court erred by failing to adequately instruct the jury not to consider evidence of prior criminal conduct against them raised during the cross-examination of Woodruff. Weger and Walkenstein contend that the district court's failure to give the requested cautionary instructions impacted on them. They contend that the district court's general instruction that the case of each defendant should be considered separately and individually, was not sufficient to cure the error.

Weger and Walkenstein assert that the cumulative effect of the repeated and systematic pattern of floating insinuations before the jury without ever establishing a basis in fact amounted to gross prosecutorial misconduct which could not be regarded as harmless error. Weger further contends that the district court erred by admitting evidence of a prior offense which occurred more than ten years prior to trial. He asserts that the probative value of a 1976 arrest for possession of marijuana while he attended college in New Mexico, on the issue of his state of mind in Florida in 1986, is tenuous. Weger argues that the prosecutor's need to present a ten-year-old unrelated incident is minimal and that the

---

**4.** Fed.R.Evid. 404(b) states:

*Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**5.** We note that Weger's ten-year-old conviction, introduced as a rebuttal to the entrapment defense, is only an extrinsic act of misconduct. Weger concedes that his ten-year-old prior conviction, used to rebut his entrapment defense, should be analyzed under the rubric of Fed.R. Evid. 403 and 404(b), and not Fed.R.Evid.

failure to exclude this prior act impaired his right to a fair trial.[5]

### 4. *The Government*

◼ The government contends that the threshold infirmity in the appellants' claims arises from an almost total lack of objection at trial. The government asserts that the prosecutor had the right to impeach and to inquire into activities which demonstrated that appellants were experienced in drug trafficking. The government also argues that the extrinsic activities were proper subjects for cross-examination because the prosecutor possessed a good faith factual basis for the questions.

The government asserts that if it had been called upon to place the facts on the record it would have done so. However, no appellant made such a request. Having heard the prosecutor assert that a factual basis existed, the government notes that the appellants did not request the demonstration of a factual basis nor a contemporary cautionary instruction. Evidence of prior acts of misconduct is admissible as a matter of predisposition in rebuttal to an entrapment defense. The decision to allow the extrinsic act evidence was within the court's sound discretion.

The government contends that remoteness, in Weger's case, did not materially alter the balance between prejudice and probative value. The lapse of ten years between offenses was not enough to warrant exclusion on the basis of Fed.R.Evid. 403 or 404(b).[6]

---

609(b) ("[e]vidence of a conviction is not admissible if a period of more than ten years has elapsed since the date of the conviction ... unless the court determines ... that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect").

**6.** Fed.R.Evid. 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

To determine whether the introduction of extrinsic offense evidence constitutes reversible error under Fed.R.Evid. 403 and 404(b), we must consider (1) whether the extrinsic offense evidence is relevant to an issue other than the defendant's character and (2) whether the evidence possesses probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Fed.R.Evid. 403. *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (in banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). Although the government normally may not introduce evidence of a defendant's predisposition to engage in criminal activity, it may do so once a defendant submits evidence which raises the possibility that he was induced to commit the crime. *United States v. Salisbury*, 662 F.2d 738, 741 (11th Cir.1981). The introduction of extrinsic offense evidence is a reliable method of proving the criminal predisposition needed to rebut the allegation of entrapment. *United States v. Salisbury*, 662 F.2d at 741.

The government offered the extrinsic evidence introduced in this case not to demonstrate bad character, but to show the predisposition necessary to rebut the appellants allegations of entrapment. The first prong of *Beechum* is thereby satisfied. Review of the evidence reveals that the second prong of *Beechum* is also satisfied: the prejudicial nature of the evidence does not outweigh its probative value. The government's cross-examinations were designed to demonstrate the appellants' criminal predispositions in rebuttal to the entrapment defense. Further, the prejudicial nature of Weger's 1976 arrest for the possession of marijuana, introduced to prove Weger's criminal predisposition, does not outweigh its probative value. Accordingly, we find no error in the introduction of evidence of extrinsic acts.

D. Explanation of Videotapes by Government Witnesses

■ Walther contends that the district court erred in allowing government witnesses to explain why the CI and the undercover agents were not depicted on the videotapes of the events which occurred in the Auburndale warehouse and why multiple copies of the videotapes were not distributed to the appellants' counsel. Walther argues that the government insinuated that the appellants posed a threat to the CI, were prone to violence, and that the appellants' counsel would use the tapes unethically or illegally. Walther argues that the district court erred by failing to cure the prejudice caused by the government.

The government contends that its witnesses' explanations were not prejudicial. The government argues that the appellants challenged the testimony below on the grounds of relevance and hearsay, and that their present objection based on prejudice is procedurally deficient. As it did at trial, the government argues on appeal that the testimony was relevant to explain why the CI and undercover agents were not observed in the videotapes despite their avowed presence at the warehouse. The government argues that the explanatory testimony was not elicited to prejudice the appellants.

■ At trial, defense counsel objected to the government witnesses' testimony based on relevancy and hearsay. On appeal, Walther contends that the testimony is prejudicial. We may only review Walther's additional objection to the extent that the admission of this testimony rises to the level of plain error. Fed.R.Crim.P. 52(b); *United States v. Sorondo*, 845 F.2d 945, 948 (11th Cir.1988). We use the plain error rule to enforce the requirement that parties object to errors at trial in a timely manner so as to provide the trial judge an opportunity to avoid or correct any error, and thus avoid the costs of reversal. *United States v. Sorondo*, at 948–49. We must apply the plain error rule when a party states an inaccurate objection just as when a party states no objection at all. In both cases, the trial judge is denied a proper opportunity to correct or avoid the error. *United States v. Sorondo*, at 949.

■ Plain error, when examined in the context of the entire case, is so obvious

that failure to notice it would seriously affect the fairness, integrity and public reputation of judicial proceedings. *United States v. Sorondo,* at 949; *United States v. Russell,* 703 F.2d 1243, 1248 (11th Cir. 1983). We are not persuaded by Walther's contention that this testimony was elicited to prejudice the appellants and the appellants' counsel in the minds of the jurors. In scrutinizing the transcript of the district court proceedings, we find that the district court committed no error, much less plain error, in allowing the government witnesses to explain why the CI and the undercover agents were not depicted in the Auburndale videotapes and why multiple copies of the videotapes were not distributed to the appellants' counsel.

## CONCLUSION

In summary, we hold that: the reverse sting operation did not constitute outrageous government conduct; *Mathews v. United States* is distinguishable from this case, thereby negating retroactive application; the prosecutor's opening statements were neither improper nor prejudicial to the appellants' substantial rights; the district court properly refused to give a supplemental instruction on the entrapment defense; the district court did not err in allowing evidence of extrinsic acts of prior misconduct; and the district court did not err in allowing the government witnesses to explain why the CI and the undercover agents were not depicted on the Auburndale videotapes and why multiple copies of the videotapes were not distributed to the appellants' counsel.

The judgments, as to all appellants, are affirmed.

AFFIRMED.