**Robert MASTROIANNI, Plaintiff,**

**v.**

**Patrick D. DEERING, Michael J. Bowers, Joe B. Jackson Jr., and Weyland Yeomans, Defendants.**

**Civ. A. No. CV293-88.**

United States District Court,
S.D. Georgia,
Brunswick Division.

Dec. 30, 1994.

See also 835 F.Supp. 1577.

Stephen L. Berry, St. Marys, GA, for plaintiff.

Grace Evans Lewis, John C. Jones, Charles M. Richards, Atlanta, GA, James A. Bishop, Carl Foster Lindberg, Brunswick, GA, for defendants.

## *ORDER*

ALAIMO, District Judge.

Plaintiff, Robert Mastroianni ("Mastroianni"), Deputy Sheriff of Camden County, Georgia, was arrested on charges that were later *nol prossed.* On June 29, 1993, Mastroianni filed this federal action against several Defendants pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983. Mastroianni's claims include (1) malicious prosecution, (2) abuse of process, (3) false arrest, (4) false imprisonment, and (5) conspiracy to commit the foregoing. Before the Court is Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion will be GRANTED in part and DENIED in part.

### *FACTS*

For several years, Mastroianni has served as Deputy Sheriff of Camden County, Georgia, serving under William B. Smith, Sheriff of Camden County. During the early part of 1991, the Camden County Sheriff's Department conducted an in-house investigation into allegations that Mastroianni was planting drugs on suspects and then arresting those suspects for possession of the planted drugs. Willie Sapp, John Glover, and Theresa Robinson all alleged that the drugs found in their possession had been planted there by Mastroianni. Polygraph examinations indicated that these three persons were telling the truth. Sheriff Smith was advised of the polygraph results, but the investigation was, nevertheless, dropped.

In the spring of 1991, District Attorney Glenn Thomas requested the Georgia Bureau of Investigation ("GBI") and the Federal Bureau of Investigation ("FBI") to conduct an investigation of Mastroianni concerning allegations that he was planting drugs on suspects. In response, a joint GBI/FBI investigation ensued. Defendant Michael J. Bowers ("Bowers"), Attorney General of Georgia, supervised the investigation. Also involved in the investigation were Defendants Joe B. Jackson, Jr. ("Jackson"), and Weyland Yeomans ("Yeomans") of the GBI, and Defendant Patrick J. Deering ("Deering"), an assistant attorney general. The parties dispute the extent and nature of each Defendants' involvement in the investigation.

During this same time period, Defendants were also investigating Sheriff William Smith for alleged unlawful use of inmate labor. On more than one occasion, Defendants questioned Mastroianni regarding the allegations against Sheriff Smith. Mastroianni claims that Defendants tried to force him into giving incriminating information against Sheriff Smith and threatened to prosecute him (Mastroianni) if he did not. Mastroianni declined to do so and, on the contrary, told Defendants that Smith was an honest man.

On July 16, 1992, Deering presented a three count indictment against Mastroianni to the Camden County Grand Jury. Count I charged Mastroianni with the offense of False Imprisonment Under Color of Legal Process, O.C.G.A. § 16-5-42, for allegedly planting drugs on Leo Polumbo and then illegally arresting him. Count II charged Mastroianni with Perjury for allegedly lying to the Magistrate in order to obtain the search warrant for Leo Polumbo's residence. Count III charged Mastroianni with False Imprisonment Under Color of Legal Process, O.C.G.A. § 16-5-42, for allegedly planting drugs on John Glover and then illegally arresting him.

Both Yeomans and Mastroianni testified before the Camden County Grand Jury. After the testimony, the Grand Jury returned a "No Bill" on Counts II and III. As to Count I, the Grand Jury returned a "True Bill," indicting Mastroianni for False Imprisonment with regard to Leo Polumbo. Thereafter, Mastroianni was arrested pursuant to a

bench warrant and released on bond that same day. Nine months later, prosecutors **nol prossed** the indictment.

***DISCUSSION***

**I. *Absolute Immunity***

Defendants, Deering and Bowers, claim that absolute immunity shields them from all liability. The Court has already addressed Defendants' claims for absolute immunity:

> Defendants, Deering and Yeomans, are entitled to absolute immunity for their testimony before the grand jury on July 16 and 17, 1992, alleged in paragraph 30 of Mastroianni's amended complaint.
>
> . . . . .
>
> Deering's filing of a notice of indictment, mentioned in paragraph 25 of Mastroianni's complaint, is a usual step in the initiation of a criminal prosecution, and is an act protected by absolute immunity. None of Defendants' other acts as alleged in Mastroianni's amended complaint is entitled to greater than qualified immunity.

*Mastroianni v. Deering,* 835 F.Supp. 1577, 1581–82 (S.D.Ga.1993). Defendants' entitlement to qualified immunity is discussed below.

**II. *Summary Judgment***

Defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Summary judgment requires the movant to establish the absence of genuine issues of material fact, such that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970). In this case, if Defendants are entitled to qualified immunity, they are also entitled to judgment as a matter of law. *See Alexander v. University of North Florida,* 39 F.3d 290, 291 (11th Cir.1994) ("[Q]ualified immunity for government officials is the rule, liability and trials for liability the exception."). Accordingly, the existence of qualified immunity is a legal question which is properly decided on summary judgment. *Ansley v. Heinrich,* 925 F.2d 1339, 1348 (11th Cir.1991). Indeed, deciding qualified immunity cases at the summary judgment stage furthers the purpose of this defense by keeping the public official "out of the courtroom, free to exercise discretionary duties under clearly established law without the constant threat of lawsuits." *Id.* at 1345. As the Supreme Court has noted, qualified immunity "is an immunity from suit rather than a mere defense to liability; and . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).

While the existence of factual disputes does not preclude summary judgment on qualified immunity, *McDaniel v. Woodard,* 886 F.2d 311, 313 (11th Cir.1989), all reasonable inferences will be made in favor of the non-movant. *Adickes,* 398 U.S. at 158–59, 90 S.Ct. at 1608–09; *see also, Bennett v. Parker,* 898 F.2d 1530, 1536 n. 2 (11th Cir.1990) (Tjoflat, C.J., concurring) ("The court considers in the light most favorable to the plaintiff all facts fairly inferable from the record—regardless of factual disputes—and decides whether, under those facts, defendant's conduct violated law clearly established at the time.").

**III. *Qualified Immunity***

In response to each of Mastroianni's claims, Defendants raise the defense of qualified immunity. The United States Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Stough v. Gallagher,* 967 F.2d 1523, 1525 (11th Cir.1992). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738. The test is now called the "objective reasonableness" standard. *Stough,* 967 F.2d at 1525.

In the Eleventh Circuit, the "objective reasonableness" standard is applied through a two-part analysis:

(1) The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."

(2) Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. The burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional laws."

*Stough,* 967 F.2d at 1526 (quoting *Rich v. Dollar,* 841 F.2d 1558, 1563–64 (11th Cir. 1988)).

The parties here do not dispute that Defendants were acting within the scope of their discretionary authority. The remaining issue is whether Defendants' actions violated clearly established constitutional law.

**A. Abuse of Process**

In ruling on Defendants' Motion to Dismiss under Rule 12(b)(6) of the Federal Rules, the Court determined that "[t]he Eleventh Circuit has not addressed the propriety of making abuse of process into a § 1983 claim." *Mastroianni v. Deering,* 835 F.Supp. 1577, 1583 (S.D.Ga.1993). Accordingly, the Court cannot find that in 1991 and 1992, Defendants violated clearly established constitutional law by committing the tort of "abuse of process." *See Lassiter v. Alabama A & M University,* 28 F.3d 1146, 1149 (11th Cir.1994) ("For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law."). The Third Circuit's decision in *Jennings v. Shuman,* 567 F.2d 1213 (3d Cir.1977), which appears to recognize "abuse of process" as a § 1983 claim, is of little consequence here, for "the case law of one other circuit cannot settle the law in this circuit to the point of being 'clearly established.'" *Hansen v. Soldenwagner,* 19 F.3d 573, 578 n. 6 (11th Cir.1994).

**B. False Arrest, False Imprisonment and Malicious Prosecution**

Mastroianni's remaining § 1983 claims include false arrest, false imprisonment, and malicious prosecution. The Court has already noted, however, that "[e]ven if Mastroianni can support all the theories which survive the motion to dismiss, he will not be entitled to as many recoveries as he has theories. The injury underlying many of the theories is the same." *Mastroianni v. Deering,* 835 F.Supp. 1577, 1582 (S.D.Ga.1993).

After reviewing the various pleadings, affidavits, and depositions submitted by the parties, the Court finds that Mastroianni's claims for false arrest, false imprisonment and malicious prosecution are all based upon the same set of facts. In essence, Mastroianni claims that he was arrested without probable cause in violation of the Fourth Amendment. He further claims that Defendants conspired to commit this constitutional violation. Accordingly, the Court hereby dismisses Mastroianni's claims for "false imprisonment" and "malicious prosecution" as duplicative of his claim for "false arrest." Whatever constitutional violations may have taken place in this case can be properly and completely analyzed under Mastroianni's claims for false arrest and conspiracy.

**C. False Arrest**

Defendants are not entitled to qualified immunity for their arrest of Mastroianni because, *under Mastroianni's version of the facts,* clearly established law dictates that Defendants acted without arguable probable cause. *See Swint v. City of Wadley, Ala.,* 5 F.3d 1435, 1443 (11th Cir.1993) ("[W]hen a law enforcement officer seeks summary judgment on the basis of qualified immunity, we must only ask whether, viewing the facts most favorably to the non-movant, there was arguable probable cause.").

In July of 1992, the Camden County Grand Jury considered a three count indictment against Mastroianni. Of these three counts, Counts I and II concerned Mastroianni's arrest of Leo Polumbo.

According to Defendants, Mastroianni "planted" drugs on Leo Polumbo by (1) misleading the magistrate in order to procure a search warrant for Leo Polumbo's residence, (2) directing a confidential informant to deliver drugs to Polumbo's residence while Polumbo was not at home, (3) executing the search warrant, and then (4) arresting Polumbo for possession. From these facts, Defendants derived two counts to present to the Grand Jury: Count I for False Imprisonment under O.C.G.A. § 16–5–42, and Count II for Perjury based on Mastroianni's search warrant affidavit. The Grand Jury returned a "True Bill" only as to Count I. Count II was no billed. Although Count II has no causal connection to Mastroianni's arrest due to the Grand Jury's "No Bill," the Court discusses it below because of its relevance to Count I.

1. *Count II: Perjury*

On March 6, 1991, Mastroianni procured a search warrant for Leo Polumbo's residence based on information allegedly obtained from Preston Kirkland, a confidential informant. Defendants believe that Mastroianni lied in order to obtain the search warrant. Accordingly, Defendants charged Mastroianni with Perjury in Count II of the indictment. Defendants brought Count II on the basis of the following sworn statement which Mastroianni made to the magistrate:

> Within the past 48 hrs affiant has been contacted by a reliable informant who has provided information in the past that has proven to be true. This reliable informant has related to affiant that within the past 24 hrs. that it has personally seen a quantity of green leafy material being stored and sold from the above location.

(Yeomans Aff. Ex. A)

The parties agree that the "reliable informant" mentioned in the affidavit is Preston Kirkland. Defendants claim that Mastroianni lied when he stated that Kirkland had seen drugs at Polumbo's residence in the 24 hours preceding March 6, 1991, because Kirkland allegedly told Yeomans that the last time he (Kirkland) was at Polumbo's residence was prior to his arrest on March 3, 1991. Accordingly, Yeomans believed that Kirkland did not see drugs at Polumbo's residence within the 24 hours preceding March 6, 1991. Defendants also suggested to the Grand Jury that Kirkland was in jail on March 5, 1991, and, thus, could not have seen drugs at Polumbo's residence on that date.

In contrast, Mastroianni claims that Kirkland bonded out of jail around 3:00 p.m. on March 5, 1991. Jail records support this assertion. That same day, Kirkland visited Polumbo's residence and observed a quantity of marijuana. Kirkland then advised Mastroianni that he had seen drugs at Polumbo's residence. If this version of the story is believed, then Mastroianni's affidavit is not perjurious. The Grand Jury apparently sided with Mastroianni on this issue and returned a "No Bill" on the perjury count.

2. *Count I: False Imprisonment Under Color of Legal Process*

As to Count I for false imprisonment, however, the Grand Jury returned a "True Bill." Mastroianni was then arrested pursuant to this one count indictment.

Mastroianni claims that his arrest was without probable cause because Defendants lied to the Grand Jury and manufactured a scenario in which it appeared that Mastroianni planted drugs on Polumbo and then illegally arrested him. According to Mastroianni, Polumbo was arrested as the result of a legitimate reverse sting operation.

Defendants have raised the defense of qualified immunity. Accordingly, the Court must determine whether the rights Defendants allegedly violated were clearly established. When deciding whether the law was clearly established, the Court must construe the facts in favor of Mastroianni. *Bennett,* 898 F.2d at 1536 n. 2 (Tjoflat, C.J., concurring); *see also, Rodgers v. Horsley,* 39 F.3d 308, 309 (11th Cir.1994). These facts are set forth below.

On March 3, 1991, Preston Kirkland was arrested for possession of marijuana. After Kirkland's arrest, Mastroianni asked Kirkland to help him arrest Leo Polumbo, a suspected drug dealer. Kirkland agreed.

Kirkland bonded out of jail around 3:00 p.m. on March 5, 1991. That same day, Kirkland visited Polumbo's residence. During the visit, Kirkland observed a quantity of marijuana in Polumbo's residence. In addition, Kirkland and Polumbo had agreed that Kirkland would deliver approximately two ounces of marijuana to Polumbo. Polumbo would then sell the drugs for Kirkland. According to Kirkland's affidavit, Polumbo had sold drugs on behalf of Kirkland on prior occasions. (Kirkland Aff. at ¶ 8) Kirkland advised Mastroianni of the drugs at Polumbo's residence and the agreement to deliver two ounces of marijuana.

Mastroianni procured a search warrant for Polumbo's residence based on the information obtained from Kirkland. After obtaining the search warrant, Mastroianni provided Kirkland with two plastic bags of marijuana which Mastroianni had obtained from the crime lab in Savannah, Georgia, pursuant to Sheriff Smith's request that the marijuana be released for purposes of Mastroianni's reverse sting operation. Mastroianni then instructed Kirkland to deliver the bags to Polumbo's residence. Kirkland and his wife, Robin, took the marijuana to Polumbo's residence. Polumbo was not home at the time, but the Kirklands left the drugs with Polumbo's wife. Kirkland then advised Mastroianni, who was waiting down the road, that he had delivered the marijuana to Polumbo's residence, but that Polumbo was not home.

Based on this information, Mastroianni went to Polumbo's residence and executed the search warrant. Mrs. Polumbo was the only person at home when the warrant was executed. Unsurprisingly, officers discovered the two bags of marijuana that had been delivered by Kirkland. They also discovered other drugs. Mastroianni then found Polumbo at another location and arrested him for possession.

Over a year after Polumbo's arrest, Mastroianni himself was arrested for violating O.C.G.A. § 16–5–42, False Imprisonment under color of legal process, for allegedly "planting" drugs on Polumbo. The applicable statute reads as follows:

> When the arrest, confinement, or detention of a person by warrant, mandate, or process is *manifestly illegal* and shows malice and oppression, an officer issuing or knowingly and maliciously executing the same shall, upon conviction thereof, be removed from office and punished by imprisonment for not less than one nor more than five years.

O.C.G.A. § 16–5–42 (1992) (emphasis added).

Based on the above facts, Mastroianni claims he was arrested without probable cause. Defendants have raised the defense of qualified immunity, requiring the Court to determine whether the rights Defendants allegedly violated were clearly established.

a. Clearly Established Law

■ Certainly, an arrest of Mastroianni without probable cause gives rise to a cause of action under § 1983. However, as recently reiterated by the Eleventh Circuit in *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146 (11th Cir.1994), one cannot rely on general propositions in deciding whether the law is clearly established:

> General propositions have little to do with the concept of qualified immunity. If case law, in factual terms has not staked out a bright line, qualified immunity almost always protects the defendant. The line is not to be found in abstractions—to act reasonably, to act with probable cause, and so forth—but in studying how these abstractions have been applied in concrete circumstances.

*Id.* at 1150 (citations and footnotes omitted).

Accordingly, the Court must articulate a more particularized factual situation to evaluate. As best as the Court can determine, Mastroianni is claiming that his arrest of Polumbo was the perfectly legal result of a legitimate reverse sting operation and, thus, could not have been "manifestly illegal" under O.C.G.A. § 16–5–42.

To find that the law is "clearly established" in this area does not mean that a court must have previously found *"the very action in question* unlawful." *Jordan v. Doe,* 38 F.3d 1559, 1566 (11th Cir.1994) (emphasis added). For example, in this case, it is not necessary for a court to have previously held that arresting a police officer for false imprisonment

based on his arrest of a drug dealer during a legitimate "reverse sting operation," violates that police officer's rights under the Fourth Amendment. It does mean, however, that "in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

In this case, the "unlawfulness" of Defendants' conduct would be "apparent" if, "in the light of preexisting law," Mastroianni's reverse sting operation was simply not illegal. *Id.* If Mastroianni's behavior was not illegal under clearly established law, then Defendants would have been on notice that "what [they were] doing," (that is, arresting Mastroianni for lawful behavior) violated Mastroianni's rights under the Fourth Amendment. *Id.* Stated another way, if Mastroianni's actions were permissible under clearly established law such that no reasonable officer could have believed otherwise, then, *a fortiori,* Defendants violated Mastroianni's right to be free from arrest without probable cause. *See Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1558 (11th Cir.1993) (noting that under arguable probable cause standard, an "officer is entitled to qualified immunity if a reasonable officer 'could have believed that probable cause existed.' ").

As discussed below, the Court finds that in July of 1992, it was clearly established in this circuit that police officers may legally conduct reverse sting operations in narcotics cases so long as their actions do not constitute entrapment, *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), or "outrageous" governmental conduct, *United States v. Russell,* 411 U.S. 423, 431, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973). The Court further finds that *when viewing the facts in the light most favorable to Mastroianni,* no reasonable officer could have believed that Mastroianni "entrapped" or acted outrageously toward Leo Polumbo. Accordingly, Defendants are not entitled to qualified immunity.

b. The Legality of Reverse Sting Operations as of July, 1992

According to Mastroianni's version of the facts, there was simply nothing illegal about what he did. Reasonable officers could not have thought otherwise. As the Supreme Court has noted:

> It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises.

*Sorrells v. United States,* 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932).

Indeed, the case law in this area has staked out a "bright line." *Post,* 7 F.3d at 1557 (11th Cir.1993):

> To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal.

*Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958).

Under Mastroianni's version of the facts, no reasonable officer could have believed that Polumbo was an "unwary innocent." Before Polumbo's arrest, Kirkland had observed drugs at Polumbo's residence and arranged a deal whereby Kirkland would deliver two ounces of marijuana to Polumbo. Polumbo and Kirkland had made similar deals in the past. Mastroianni merely provided another opportunity to an unwary criminal. As the Fifth Circuit stated in the 1920s, "where the participation of a government agency in a transaction which results in the commission of a crime amounts only to placing facilities for its commission in the way of one suspected of a willingness to commit it, such facilitating or affording of an opportunity to commit the crime is not a defense to the perpetrator of it." *Aultman v. United States,* 289 F. 251 (5th Cir.1923).[1]

In qualified immunity analysis, however, the inquiry is perhaps more fact-

1. The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

specific. Here, Mastroianni conducted a "reverse sting operation." In such an operation, undercover police officers arrange to sell "previously confiscated drugs" to "would be buyers under carefully controlled conditions." *United States v. Walther,* 867 F.2d 1334, 1335 (11th Cir.1989). Following the sale, the purchaser is arrested. It is clearly established in this circuit that reverse sting operations are indeed permissible:

> Appellants contend that the government's conduct in regard to the reverse sting, i.e., initiating the negotiations, providing the location for the transaction, providing the transportation for the narcotics, and supplying the narcotics, was so outrageous and unconscionable that it violated their due process rights.
>
> Although conviction may be overturned where government involvement in criminal activities is so extensive that it may be characterized as outrageous, government involvement in criminal activities is constitutionally impermissible only where it violates fundamental fairness and shocks the universal cause of justice. *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *Owen v. Wainwright,* 806 F.2d 1519, 1521 (11th Cir.1986). Appellants must show extreme circumstances of outrageous government conduct to establish a due process violation. ***Challenges to the reverse sting method of police investigation have been rejected by this court on numerous occasions.*** *Owen v. Wainwright,* 806 F.2d at 1522. *See United States v. Savage,* 701 F.2d 867, 869–70 (11th Cir.1983); *United States v. Gianni,* 678 F.2d 956, 960 (11th Cir.1982). When reviewed in light of the aforementioned precedent, the appellants' assertion of outrageous conduct in this case is meritless. The investigation in the case neither violates fundamental fairness nor shocks the universal cause of justice. Accordingly, we hold that the government's activities did not constitute outrageous or constitutionally impermissible conduct.

*Id.* at 1338–39 (emphasis added).[2]

Based on the above precedent, Defendants were on notice that Mastroianni's reverse sting operation was permissible under clearly established law. Accordingly, since Defendants arrested Mastroianni for permissible conduct, they are not shielded by qualified immunity.

The Court notes that merely because Defendants are not entitled to qualified immunity does not mean that they necessarily violated Mastroianni's constitutional rights. At trial, Defendants may produce evidence tending to contradict Mastroianni's version of the facts, thereby precluding recovery. For example, Defendants may establish that Polumbo never requested any drugs, or that Mastroianni knew Polumbo was not at home but delivered the "unrequested" drugs anyway. At this stage, however, under the facts viewed in favor of Mastroianni, no reasonable officer could have believed that Mastroianni's actions were criminal.

c. Misdirection of the Grand Jury

■ Defendants argue that the Camden County Grand Jury's indictment breaks the chain of causation and shields them from liability for false arrest. In this case, however, Mastroianni claims that Defendants misled the Grand Jury. Accordingly, the Grand Jury's indictment is not *prima facie* evidence of probable cause and does not break the causal chain with respect to Defendants' liability. *Hand v. Gary,* 838 F.2d 1420, 1426–28 (5th Cir.1988) ("Any misdirection of the magistrate or the grand jury by omission or

2. While the facts in *Walther* are not exactly the same as the facts in this case, such is not required:

> When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon a precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar.

*Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1573, 1575 (11th Cir.1992) (Edmondson, J., dissenting), *approved en banc,* 998 F.2d 923 (11th Cir.1993).

commission perpetuates the taint of the original official behavior.").

Perhaps the most significant misrepresentation that Defendants made to the grand jury involves whether Polumbo agreed to accept drugs from Kirkland, the confidential informant. During the Grand Jury proceeding, the following exchange took place between Defendant, Deering, as the prosecutor and Defendant, Yeomans, as the witness:

> Q: All right. Based on your investigation, was it determined at any time that Mr. Kirkland had an agreement to deliver that marijuana to Mr. Polumbo's house?
>
> A: No, sir.

(Mastroianni Dep. Ex. 25 at 8.)

Yeomans gave the above testimony despite the existence of the following interview summary contained *in his own files:*

> At approximately 1:25 on Wednesday May, 29, 1991, ASAC W.J. Yeomans and Special Agent G.C. Harrell of the Georgia Bureau of Investigation interviewed Mr. Leo Charles Polumbo.
>
> * * * * * *
>
> Mr. Polumbo stated on March 5 or March 6, 1991, at approximately 11:00 a.m. Preston Kirkland came to his residence and asked Mr. Polumbo if he could get rid of some weed (meaning marijuana) for him. Mr. Polumbo stated he did not have any money, and Kirkland stated he would front the marijuana for him. *Mr. Polumbo stated O.K.,* and Mr. Kirkland told Mr. Polumbo he would bring approximately two ounces of marijuana at approximately 1:30 to 2:00 p.m. on the same evening, this being either March 5 or March 6, 1991.

(Mastroianni Dep. Ex. 26.) (emphasis added)

Indeed, Defendants admit that "Yeomans mistakenly told the Grand Jury that it was not determined that Polumbo had agreed for Kirkland to bring the marijuana to his house." (Defs.' Br. in Supp. of Mot. for Summ.J. at 22) Accordingly, Defendants cannot hide behind the Grand Jury's indictment.

3. Defendants' Argument Regarding the Relationship between Count I and Count II

After reading the various briefs and affidavits, it appears that the pivotal question regarding the legitimacy of Mastroianni's sting operation is whether Polumbo requested drugs:

> The substance of the charges from Count I of the indictment stem from one simple fact: Did Leo Polumbo request that two ounces of marijuana be delivered to his residence? If so, his arrest was legal, if not, it was a set-up.

(Pl.'s Br. in Opp. to Defs.' Mot. for Summ.J. at 48)

As noted above, when viewing the facts in the light most favorable to Mastroianni, Polumbo did request drugs. (Mastroianni Dep. Ex. 26; Kirkland Aff. at ¶ 6.) Defendants dispute this fact and appear to maintain that Polumbo did not request the drugs. This position, however, is severely compromised by Polumbo's own statement which indicates that he indeed requested the drugs. To make matters worse, Polumbo's statement is contained in the Defendants' own files. In what appears to be an effort to avoid the effect of Polumbo's statement, Defendants make the following argument:

> Even if it were true that Polumbo agreed for the marijuana to be brought to his house by the informant, Kirkland, this fact did not establish that Polumbo's arrest was legal.... [I]t was Plaintiffs perjured affidavit in support of the search warrant that rendered Polumbo's arrest illegal, not the planting of drugs at Polumbo's house.

(Defs.' Br. in Supp. of Mot. for Summ.J. at 19)

Defendants appear to argue that Count I of the indictment (False Imprisonment) was entirely dependant on whether Mastroianni committed perjury as alleged in Count II. As stated earlier, however, the Grand Jury found that, in all probability, Mastroianni did not commit perjury. Accordingly, if Defendants' new argument is accepted, and Counts I and II of the indictment were indeed interdependent, then the Grand Jury's "No Bill"

on Count II destroys probable cause for Count I. Thus, under Defendants' own analysis, (which, of course, was not explained to the grand jury), Defendants lacked even arguable probable cause to arrest Mastroianni under Count I once the Grand Jury returned a "No Bill" on Count II.

### D. Conspiracy

Conspiracy to violate Constitutional rights is actionable under § 1983. *Strength v. Hubert,* 854 F.2d 421, 425 (11th Cir.1988). Mastroianni's conspiracy claims, however, are contingent upon the viability of the underlying § 1983 claims. Accordingly, based on the above discussion, Mastroianni's conspiracy claims will be dismissed except with regard to false arrest. With respect to false arrest, depositions and affidavits reveal sufficient evidence from which to conclude that Defendants "reached an understanding" to violate Mastroianni's constitutional rights. *Bailey v. Board of County Comm'rs of Alachua County,* 956 F.2d 1112, 1122 (11th Cir. 1992).

### *CONCLUSION*

Defendants' motion for summary judgment is GRANTED with respect to Mastroianni's claims for abuse of process, false imprisonment, malicious prosecution, and conspiracy to commit the foregoing. Defendants' motion is **DENIED** with respect to Mastroianni's claims for false arrest and conspiracy to commit false arrest.

SO ORDERED.